UNITED STATES of America,
Appellee.

v.

Sebastiano NANI, Defendant-Appellant.

No. 107, Docket 23227.

United States Court of Appeals,
Second Circuit.

Argued Dec. 7, 1954.

Decided Jan. 28, 1955.

Henry G. Singer, Brooklyn, N. Y. (Harry Silver, Brooklyn, N. Y., on the brief), for defendant-appellant.

Leonard P. Moore, U. S. Atty. for the Eastern Dist. of New York, Brooklyn, N. Y. (Edgar G. Brisach, Jerome Lewis, Marie L. McCann, Asst. U. S. Attys., Brooklyn, N. Y., of counsel), for appellee.

Before CLARK, Chief Judge, and MEDINA and HARLAN, Circuit Judges.

MEDINA, Circuit Judge.

Defendant was charged in the indictment with two substantive offenses under 18 U.S.C. § 201; the first, the making of a promise to pay one Thomas Dugan, a government narcotics agent, $4,000 for the purpose of influencing him to violate his lawful duty to the United States, the second, the payment to Dugan of $2,500 in currency for the same purpose. The jury disagreed as to the first count, but found defendant guilty on the second. The appeal from the judgment of conviction raises a number of points, which we find it unnecessary to discuss, including some based upon undignified and improper remarks by the trial judge. An unjustified and prejudicial interruption of counsel's summation, however, the harmful effect of which was magnified by erroneous and confusing instructions on the subject of entrapment, in effect took from the jury the central issue contested at the trial; and there must be a new trial.

The factual background has to do with the defendant, Nani, a family of Piacentis, and the government agent Dugan. The events in issue occurred in the period between September 14, 1952, during the evening of which day Dugan had certain conversations with Frank Piacenti, and November 1, 1952, when Nani was taken into custody immediately after handing over $2,500 in cash to Dugan.

On March 7, 1952, Dugan had arrested Nani in Brooklyn, New York, on a narcotics charge pending against Nani in California. Prior to the sequence of events commencing in September, Peter Piacenti, one of five Piacenti brothers, had been arrested in California on a narcotics charge and, a few days prior to September 14, Dugan and certain other government agents had visited the house of Joseph Piacenti in Brooklyn, where they searched the premises and interrogated Sarah Rozzione, a sister of the

Piacentis. Dugan testified that a newspaper clipping was found relating the facts about Nani's arrest; and there is evidence in the record to justify an inference that Nani and at least some of the Piacentis had dealings together, which may or may not have related to the traffic in narcotics.

The principal issue in the case was the familiar one of entrapment; and the substance of Nani's defense was that the idea of the alleged bribery was conceived by Dugan and that, with no predisposition whatever to commit such an offense, Nani was lured on and induced to hand over the money. Added to this was testimony by Nani that Dugan had held a gun against him on the occasion of their first meeting in the fall of 1952 and that the continuing fear thus induced was an additional reason for delivering the cash to Dugan. There was more than sufficient evidence in the testimony of several government agents, and in the undisputed attendant circumstances, to warrant the jury in rejecting Nani's claims as sheer fabrication. But the questions of fact raised by the conflicting versions of what took place as the various incidents developed should have been submitted to the jury in such fashion as to make it reasonably clear what the issues raised by the claim of entrapment were and to permit the jury to decide these issues without so circumscribing and limiting them as to distort and confuse the whole picture.

The scene opens with Dugan and Frank Piacenti talking together on the evening of Sunday, September 14, at The Show Boat bar in Brooklyn. Frank had telephoned to Dugan and suggested the meeting. Later in the evening Joseph Piacenti joined them. On the issue of what was said the versions of Dugan on the one hand and the Piacentis on the other are in irreconcilable conflict. Dugan testified that Nani's name was first brought into the conversation by Frank; that Frank, after asking what could be done for his brother Peter and after being informed that Peter had better plead guilty and cooperate with the govern-ment, had said "would money help" and added "not me, I haven't got any money but Nani has." This was followed up, according to Dugan, by Frank's suggestion that Dugan talk to Nani, to which Dugan replied, "I told him that I would speak to anyone if they wanted to speak to me."

The opposite version of the conversation, as testified by Frank Piacenti, was that Dugan was the one who first brought Nani into the conversation saying, "There is a man that is worth plenty of money." Moreover, if Frank is to be believed, Dugan said "I would give my right arm to get this man" (meaning Nani), and it was Dugan who suggested that Frank get in touch with Nani, and who said, "I think for the price of a Cadillac maybe we can straighten things out."

Nani's testimony fits into the pattern of that of Frank; and it is not in dispute that Frank was given Dugan's supervisor's telephone number and Nani called Dugan up, and this led to a series of meetings and conversations with respect to which the testimony is again hopelessly conflicting.

Nani was pretty well discredited on cross-examination and his counsel faced a formidable task on summation. But he proceeded with some skill to approach the issue of who at the initial conference at The Show Boat bar, originated the idea of a meeting between Dugan and Nani. After dwelling on the fact, as testified by Nani and the two Piacenti brothers, Frank and Joseph, that they barged in on Nani at his home at four o'clock in the morning of the Sunday in September above referred to, and told Nani to call Dugan, the following occurred, in the course of summation by counsel for Nani:

> "Frank says, and if Frank lied then he deliberately, with malice aforethought, went out to get Nani into trouble. If he didn't lie, then Dugan deliberately, with malice aforethought, went out to get Nani into trouble—either one of the two

of them—and as far as I can see the facts, it makes no difference.

"The Court: Yes, there is, Mr. Singer. There is quite a difference. I say that there is no evidence here of any entrapment or any coercion by Frank and the Government is not responsible for any coercion by Frank, even if the Government employees did it or nobody did it. You follow my instructions and do not say it makes no difference that Frank tried to entrap him or not, because there is not one bit of evidence—

"Mr. Singer: May I respectfully except to your Honor's ruling, and I say as to having named someone, to draw the conclusion that I think can be drawn from the inference in the testimony.

"The Court: Take your exception.

"Mr. Singer: I have taken it.

"The Court: You are going to tell this jury before you get through what you say your defense is, because I honestly, as a judge, still do not understand your defense, and I wish you would enlighten me.

"Mr. Singer: If your Honor wouldn't—

"The Court: Don't do it in your summation.

"Mr. Singer: If you do not want me to do it my way, then I cannot—

"The Court: You will not refer to Frank entrapping the defendant, because that is not the way you opened up to charge, because there is no evidence to that here, and I won't let you sidestep to hang it—

"Mr. Singer: I respectfully except to your Honor's statement and I now move for a mistrial in view of your Honor's ruling."

The effect of these comments by the Court was to scotch *in limine* any discussion on the subject of who originated the suggestion that Nani and Dugan get together, presumably on the question of paying money to fix the case. And it was quite evidently the view of the Court that discussion of who started this idea on its way was taboo "even if the government employees did it or nobody did it."

According to well settled legal principles, applicable to government agents as well as others, *qui facit per alium facit per se;* and if the scheme of the bribery was conceived by Dugan, who used Frank Piacenti as his dupe to lure Nani into contact with Dugan and Dugan then, despite Nani's reluctance and expressed desire not to become entangled and his lack of any predisposition to commit such a crime, led him on and induced him to hand over the money, a jury might find entrapment; and the defense would not fail simply because it was Frank Piacenti who passed along to Nani the suggestion that Nani communicate with Dugan on the subject of fixing his case in California.

For some reason which we are at a loss to understand, the trial judge seems to have thought the only significant issue related to the claim that Dugan had drawn a gun on Nani, for he charged the jury, "If you find from this evidence and you believe that a gun was put up against this man at any time, you acquit him." The instructions contain no clear, or even intelligible, statement of what constituted the defense of entrapment. The Court may well have thought the evidence of entrapment was weak and inherently improbable, under the circumstances, and we are inclined to agree; but weighing the evidence is a function of the jury and not of the Court. The charge on this subject, to which exception was duly noted, follows:

"And so we start in a barroom where Dugan meets Frank Piacenti. Well, now, you heard me stop Mr. Singer when he started to say that Frank Piacenti was the cause of the entrapment. If you will pay heed to that statute, only a Government employee can entrap you, and that is why I stopped it, I didn't want you to get off on a tangent and later on you will see what I mean by that,

and the importance of Frank Piacenti's testimony is that that was the beginning of this chain of events that happened later on, and he testified that when he found who Dugan was they had a conversation about narcotics at the docks, which was probably very natural. Dugan is looking for information all the time, he is a law enforcement agent.

"And then it came around to Nani, and as between Dugan and Frank Piacenti, Dugan gave Frank Piacenti a telephone number and he said or Frank Piacenti said—and it does not matter who said it—'Have Nani call me.'

"Now there is nothing up until that time excepting that perhaps you can infer that Frank Piacenti was trying to help his brother Peter. I don't know. There does come a time, though, when Nani calls Dugan and Dugan testified that Nani asked him could he see him. That is quite important, it seems to me. You give it whatever weight you want, but it seems to me important to put your finger on who started this chain of events—these four meetings—as a result of Nani calling Dugan, and Nani admits he called Dugan and Dugan admits Nani called him. So you won't have any trouble deciding that point of issue. As a result of that call that was made on September 25th, Dugan said, with the other agents who heard the conversation, that Nani asked him what he could do to help him in his California case. I am not going to review that testimony, it is fresh in your mind, you heard what Dugan said. Dugan said he would do what he could."

Indeed, the trial judge told the jury that he could not make out what the defense was, intimating that it was just lawyer's talk. At this point in the charge the instruction about the gun was repeated, in these significant words, "[I]f Nani passed this bribe because of any threats to his life, because of any gun being put against him to make him pay the money, that is entrapment, ladies and gentlemen, and you must acquit him."

But the elements of the defense of entrapment were stated in precise and unambiguous terms in the opinion of Chief Justice Hughes in Sorrells v. United States, 1932, 287 U.S. 435, 53 S.Ct. 210, 77 L.Ed. 413 [1]; and it was clearly prejudicial error so to muddy up the question as virtually to leave the jury completely in the dark on what was the law applicable to the subject.

The errors above described were compounded when the jury, evidently in complete mystification of how they were to proceed, and after some hours of futile discussion, submitted a question and received the following answer:

"The Court: The jury sends in this question:

" 'If I feel that a conspiracy between Dugan and Piacenti was in the making is that a form of entrapment?'

"Ladies and gentlemen, I instructed you that you must find that there is evidence that Dugan entrapped him into paying this bribe or offering the bribe. I do not care where it started. If you find evidence of the entrapment anywhere by Dugan, you can consider that in deciding whether he is guilty or not guilty."

An exception to this statement was duly noted.

Accordingly, there must be a new trial of all the issues tendered by the indictment, at which time, should the proofs be substantially the same as before us now, the case may be submitted to a jury with a proper charge on the subject of entrapment.

Reversed and remanded.

---

[1] See also United States v. Sherman, 2 Cir., 1952, 200 F.2d 880.