**UNITED STATES of America, Appellee,**

v.

**Fred STEINBERG and Dennis Riese, Defendants-Appellants.**

**Nos. 373, 374, Dockets 76–1253, 76–1258.**

United States Court of Appeals, Second Circuit.

Argued Oct. 29, 1976.

Decided March 7, 1977.

Lawrence Iason, Asst. U. S. Atty., New York City (Robert B. Fiske, Jr., U. S. Atty. for S. D. N. Y., and Elkan Abramowitz, Chief, Crim. Div., New York City, on the brief), for appellee.

Joyce Krutick Barlow, New York City (Barlow, Katz & Barlow, New York City, on the brief), for Steinberg.

Milton S. Gould, New York City (Shea, Gould, Climenko & Casey, Ronald H. Alenstein and John J. Grimes, New York City, on the brief), for Riese.

Before LUMBARD and VAN GRAAFEILAND, Circuit Judges, and BONSAL, District Judge.*

LUMBARD, Circuit Judge:

Fred Steinberg and Dennis Riese appeal from judgments of convictions entered on May 21, 1976 by Judge Inzer B. Wyatt of the Southern District following an eight-day jury trial. Their principal claim on appeal is that they were victims of entrapment and should have been acquitted as a matter of law. We affirm the convictions.

Counts 2 through 7 of the indictment charged Steinberg and Riese with offering bribes to public officials in violation of 18 U.S.C. § 201(b); free meals were the bribe alleged in count 2, and $1000 in cash was the bribe alleged in each of the last five counts. Count 1 charged the defendants with conspiring to violate § 201(b) and to defraud the United States by unlawfully influencing the course of investigations by the Immigration and Naturalization Service. 18 U.S.C. § 371. The principal evidence against the defendants at trial came from testimony by two of the INS agents whom they attempted to influence and tape recordings of several meetings with the agents.

Agent John Volpe of the INS testified that on March 19, 1975 he and other INS agents went to a Brew Burger restaurant at Third Avenue and 59th Street in Manhattan to investigate reports that the restaurant was employing illegal aliens. While the agents were questioning restaurant employees, Steinberg appeared and identified himself as the night supervisor of all Brew Burger restaurants. He asked Volpe whether Volpe could overlook some of the illegal aliens, whether they could "work something out," and whether Volpe could notify him in advance of future raids. Steinberg also bragged that he had an illicit parking arrangement with city officials. Upon returning to INS headquarters, Volpe reported the conversation with Steinberg to his superiors, who instructed him to pursue his investigation of both Steinberg and the Brew Burger chain.

On March 31, Volpe, his partner, Agent Joel Moskowitz (who also testified at trial), and other INS officers went to another Brew Burger at Seventh Avenue and 34th Street. Shortly after their arrival, Steinberg appeared at the scene and again asked if something could be worked out. Agent Moskowitz replied, "No. Don't you ever say that again or you will be in big trouble," and walked away from the conversation. Steinberg then asked Agent Volpe not to arrest his girlfriend, who was one of

*Of the Southern District of New York, sitting by designation.

the illegal aliens at the restaurant; Agent Volpe agreed and wrote out a pass to protect Steinberg's girlfriend from any future arrests. On April 9, at the request of his INS supervisor, Volpe prepared a memorandum of this March 31 conversation with Steinberg.

On April 29, Volpe and several colleagues raided a Brew Burger restaurant at 109 East 42nd Street, and Volpe requested the restaurant manager to contact Steinberg on the telephone. In the conversation that followed, Steinberg asked Volpe not to hit any more Brew Burgers that evening. Volpe agreed and then suggested a subsequent meeting with Steinberg to discuss the subject of "working something out." Following this April 29 conversation Volpe and Moskowitz had a series of meetings with FBI agents and an Assistant United States Attorney, and agreed to wear recording devices at all future meetings with Steinberg. They were instructed to see if Steinberg was going to offer them money and to "jump on the bandwagon" if he asked for "green cards."[1]

On May 6, Volpe and Moskowitz went to a Brew Burger at Seventh Avenue and 32nd Street and asked the manager to telephone Steinberg as arranged. When Steinberg arrived and complained that the agents were really "blitzing" the Brew Burger chain, Volpe responded that he was there to work out a deal to remedy that situation. It was during this conversation that appellant Riese first appeared on the scene. Riese's father owned the Brew Burger chain, and he was Steinberg's fellow supervisor. Riese suggested a cooperative venture with the agents: "[I]f we knew that you were coming there are certain people who we really don't mind losing out on. . . . Then we could set it up for you to look good. Take some people out." He also asked if there were any way the agents could help him to get a green card for one of his managers, explaining that Brew Burger had tried to obtain such a card once before for a manager but had

been turned down. Volpe replied: "But you see, you didn't have a hook . . . I am a nice hook, you know." Then:

> Riese—"You ought to have some dinner on us a couple of times, ha, ha, you know, we can do the same hook."
>
> Moskowitz—"The thing what you got to do . . ."
>
> Riese—"I don't know if you guys like, er, basketball or hockey tickets, we can get a lot of them"
>
> Volpe—"We will see, you know, there's . . ."
>
> Riese—"I mean stuff like that. I give them out to all my friends."

Riese and Steinberg each reiterated the offer of free meals a few minutes later. The agents rejected Riese's suggestion, however, indicating that money was the best way to return any favors. Riese responded that this was "the worst thing" and that he was "very, very, very reluctant to do it." The agents replied that they too had been reluctant at first, but that now they knew how to play the angles like a lawyer so as to guarantee results. Volpe said: "We are not being crooked." As the conversation continued, however, Riese continued to express reluctance about the payment of money bribes, and the meeting concluded without a money bribe being offered.

Following this meeting Riese informed his supervisor, Eamonn Dolan, of the substance of the INS agents' request. Dolan, who testified for the government at trial, instructed Riese not to interfere with INS removal of illegal aliens from Brew Burger restaurants and not to have any further contact with the agents.

On May 14, Volpe, Moskowitz, and Steinberg met at a Brew Burger restaurant at Third Avenue and 52nd Street. Steinberg told the agents that the company should not fund any bribes because of the risks involved, but he offered to find Brew Burger employees who would themselves be willing to pay $1000 each to obtain green cards. It was ultimately agreed that Steinberg would locate five interested aliens, check their

1. A "green card," Immigration Form I–151, is issued to every alien lawfully admitted into the United States for permanent residence. 8 C.F.R. § 101.3.

backgrounds to make sure that they had no criminal records or other blemishes that would impede the certification process, and arrange for himself and Riese to sign the required employment certificates.

On May 22, the agents met with Steinberg and Riese during another raid of a Brew Burger at Second Avenue and 42nd Street. The conversation turned to the subject of green cards:

Riese—"And you'll give them a card and they'll give you the . . . ."

Volpe—"I need a photo. When I give you the forms you gotta tell them to go to the Five and Ten and get four pictures for half a buck. Tell them to give me at least three of them in case I mess one up or something, or one of the cards gets messed up downstairs. They always want two or three photos, right?"

Steinberg—"Then they'll give you the money?"

Volpe—"Give us the money when we give them the form."

Riese—"I don't know anything about this. I don't know what you're talking about money, shit, Fred, you must know what he's talking about."

Steinberg—"Ha, ha, ha, ha, ha."

Later in the conversation, Riese asked that the agents arrange for fewer aliens to be arrested at each successive raid in order to be able to justify to INS superiors an eventual phasing out of Brew Burger raids.

When Riese left, Volpe and Moskowitz gave Steinberg a ride to the lot where his car was parked. During the ride, Steinberg announced that he himself intended to sign all the employment certification forms because Riese wanted not to get involved. However, since the FBI had asked for additional incriminating evidence on Riese, Volpe told Steinberg there might be problems processing the applications if they were all signed by the same person. Steinberg said he would try to persuade Riese to change his mind. It was also agreed that in

view of Steinberg's services as intermediary, his girlfriend should receive her green card without payment.

The agents next met with Steinberg on May 27, gave him the application forms for green cards, and explained how they should be filled out. Steinberg returned the completed forms a few days later. Some were signed by him and some by Riese.[2]

On June 12, as arranged, Steinberg and his girlfriend came to the Commodore Hotel where Volpe and Moskowitz gave Steinberg's girlfriend a green card. The other aliens also arrived at prescribed times, paid $1000 to the agents, and received their green cards. Steinberg, his girlfriend and all the aliens were arrested as they left the hotel. Riese was arrested the same day.

Neither Steinberg nor Riese took the stand at trial or presented any witnesses on his own behalf. The jury found both defendants guilty on all seven counts; Judge Wyatt suspended the imposition of sentence and placed both defendants on probation for three years under the Youth Corrections Act, 18 U.S.C. § 5010, which can be applied to young adult offenders under 18 U.S.C. § 4209.

## DISCUSSION

The defense of entrapment is designed to protect innocent persons from being convicted for crimes that government agents have unfairly tricked or persuaded them into committing. "[T]he controlling question [is] whether the defendant is a person otherwise innocent whom the Government is seeking to punish for an alleged offense which is the product of the creative activity of its own officials." *Sorrells v. United States*, 287 U.S. 435, 451, 53 S.Ct. 210, 216, 77 L.Ed. 413 (1932). Two stages of inquiry are involved. First, the defendant must prove by a preponderance of the evidence that the crime charged was initiated or induced by a government agent. *United States v. Braver*, 450 F.2d 799, 801–

---

**2.** Some of the aliens testified at trial that Riese had referred them to Steinberg in connection with obtaining these green cards. They also testified that Riese had expressed reluctance and disapproval of the venture.

03 (2d Cir. 1971), cert. denied, 405 U.S. 1064, 92 S.Ct. 1493, 31 L.Ed.2d 794 (1972). Thereupon the burden shifts to the government to prove beyond a reasonable doubt that the defendant was predisposed to commit the offense. *Sherman v. United States*, 356 U.S. 369, 373, 78 S.Ct. 819, 2 L.Ed.2d 848 (1958); *United States v. Licursi*, 525 F.2d 1164, 1167–69 (2d Cir. 1975); *United States v. Rosner*, 485 F.2d 1213, 1221–22 (2d Cir. 1973), cert. denied, 417 U.S. 950, 94 S.Ct. 3080, 41 L.Ed.2d 672 (1974); *United States v. Sherman*, 200 F.2d 880, 882 (2d Cir. 1952). Since in this case a correctly-charged jury found both defendants guilty, we should reverse only if we are convinced that the evidence of predisposition was too scanty to support a conviction by reasonable jurors.

The evidence of appellant Steinberg's predisposition was substantial. From the outset he entreated the agents to "work something out," and made frequent requests for prior notifications of INS raids. He actively participated in the development of the green card purchase plan, and was an indispensable intermediary between the agents and the aliens who purchased the cards. As part of the deal, Steinberg's girlfriend received an illegal green card free.

On the first two counts the evidence against Riese was equally strong. In his first meeting with the agents, Riese himself proposed the plan of setting up some aliens so as to make the agents look good while at the same time benefiting Brew Burger. Later in the same conversation, without prompting, Riese twice offered to bribe the agents with free meals and sports tickets if they would help in obtaining a green card. Riese was also the first to suggest that the agents should arrest fewer aliens at each successive Brew Burger raid and eventually stop raiding altogether.

There was also sufficient evidence for the jury to find predisposition on counts 3 through 7. In Riese's first meeting with the agents, he was ready and willing to offer them illegal bribes to obtain special consideration. Although Riese said on several occasions that he did not want to be a party to any cash bribes, this does not necessarily mean that he had a determination not to become involved in anything illegal; he may simply have been worried at the thought of money bribes and the increased risk of being caught. Riese was not bullied into making a snap judgment; if he felt he was being pressured into an illegal bribery scheme against his will, he had ample time to consult with others in the restaurant chain, which was owned by his family. He ignored the advice of his immediate superior, Dolan, who instructed him to have nothing to do with the agents. Riese's ultimate acquiescence in the bribery scheme may have been motivated by friendship with Steinberg or sympathy for the aliens involved, but it was not unreasonable for the jury to conclude that Riese all along was simply searching for a way to circumvent the law at minimum risk. Since the jury listened to the tapes, they could give intonations, pauses, and other oral clues such weight as they thought proper. Impressed by the seriousness of money bribes, Riese may have been attempting to protect himself by expressing reluctance, feigning ignorance, and leaving it to his fellow supervisor, Steinberg, to lead. We thus conclude that the evidence supported convictions of both defendants on all counts.

The judges of the majority are no less sensitive to overreaching by government investigators and prosecutors than is our dissenting brother. But we believe that twelve jurors who saw and heard the witnesses and saw the defendants throughout the eight days of trial are far better judges of the facts than we who sit in a more rarified atmosphere reading a black and white appellate record. Surely jurors are as sensitive to claims that agents of the government have used unfair methods in obtaining evidence and leading otherwise innocent persons to violate the law. The very same sentiments which the dissent so eloquently expresses were argued to the jury and nevertheless they were persuaded beyond a reasonable doubt of the defendants' guilt. Under the circumstances we think it would be going beyond the appropriate limits of judicial review for three

appellate judges to second-guess the unanimous verdict of twelve jurors.

■ Nevertheless, appellants argue that the actions by the government's agents in this case were so reprehensible an invasion of their right to be left alone that automatic acquittals are required as a matter of due process of law or under the supervisory power of the federal court. The Supreme Court has not yet decided whether truly outrageous overreaching by government investigators in an entrapment case might warrant an acquittal regardless of a defendant's personal guilt. See *Hampton v. United States*, 425 U.S. 484, 491–95, 96 S.Ct. 1646, 48 L.Ed.2d 113 (1976) (Powell, J., concurring). We, likewise, need not resolve that legal issue here, as the investigative techniques used in this case were certainly not improper. The agents simply pursued and expanded on corrupt suggestions that were initially made by one of the defendants.[3]

■ Appellants' other contentions can be disposed of briefly. The prosecutor's jury summation did no more than marshal the evidence and draw reasonable inferences therefrom. This is permissible and did not deprive appellants of a fair trial. *United States v. Wilner*, 523 F.2d 68, 73 (2d Cir. 1975). Appellant Steinberg urges that the government should have been required to prove the chain of possession of the tape recordings from the time they were made to the time of trial. No statute or court rule imposes such a burden on the government, and the testimony of Volpe as to the authenticity and accuracy of the tapes laid a sufficient foundation for their admission. *United States v. Knohl*, 379 F.2d 427, 440 (2d Cir.), cert. denied, 389 U.S. 973, 88 S.Ct. 472, 19 L.Ed.2d 465 (1967). Finally, Judge Wyatt did not abuse his discretion in failing to ask specific questions proposed by appellant Steinberg for the voir dire examination of prospective jurors. *United States v.*

*Reed*, 526 F.2d 740, 741–42 (2d Cir. 1975), cert. denied, 424 U.S. 956, 96 S.Ct. 1431, 47 L.Ed.2d 361 (1976). Judge Wyatt's questions substantially covered the area of Steinberg's requests, and there has been no demonstration of prejudice resulting from the failure to ask the questions in the suggested form.

Convictions affirmed.

VAN GRAAFEILAND, Circuit Judge, dissenting:

When that great English lyricist and lawyer, Sir William Gilbert, wrote that a policeman's lot is not a happy one, he knew whereof he spoke. Our law enforcement officers are calumniated by criminals, castigated by their attorneys, excoriated by the media, and criticized by the courts. Because we expect our lawmen to have the patience of Job and the wisdom of Solomon, much of our criticism, I am convinced, is unjustified and unfair. However, when a law enforcement officer forgets that his job is to apprehend criminals—not to create them, to prevent crime—not to incite it, he merits no words of approbation from any judge. *Butts v. United States*, 273 F. 35, 38 (8th Cir. 1921). This, I believe, is such a case.

Two eager, young immigration officers, playing at being policemen, cozened, wheedled and bedevilled two equally young men, innocent of any previous criminality, into committing unlawful acts from which they stood to gain not one penny for themselves. Although my lone voice cannot repair the harm which has been done, it can express my disapproval of the tactics which have branded these young men with the ineradicable tag of "criminal".

Without again recounting the facts as set forth in the majority opinion, I would merely add some illuminating details which have been omitted. It is clear from the record

---

**3.** The statements by the agents that appellants criticize most strongly are Agent Volpe's assurances to them that the green card arrangements were "legal." Viewed in context, however, these statements appear to relate only to Volpe's processing of the green cards, which

was legal, and not to the bribes themselves, which were obviously illegal. It is clear from the defendant's own statements that they knew that bribery is a crime. Volpe was simply trying to assure them that his green cards would withstand future scrutiny.

that early in 1975 the INS began a series of raids against the Brew Burger chain. INS agents' first contact with either defendant took place on March 19, when they met defendant Steinberg. It is undisputed that at that meeting Steinberg asked whether they could "work something out" and whether he could be advised in advance of future raids so that he could make arrangements for other employees to cover for arrested aliens. It is also undisputed that this was not an unusual request and that no inducement or bribe of any sort had been offered or suggested by Mr. Steinberg. One of the INS witnesses testified that at the close of this conversation he believed Mr. Steinberg to be a decent, honest young man.

It is undisputed that during the second meeting with Steinberg on April 9 there was again no offer of a bribe. Despite this fact, a memorandum prepared by Agent Volpe following the meeting contained the caption "Attempting to Gain Immigration Benefits by Offering a Bribe to a Service Officer."[1] It was at this meeting that the conversation concerning Steinberg's girlfriend took place and she was given a pass by Agent Volpe. To make the record complete, it should be pointed out that a pass simply permitted the holder to come voluntarily to the INS office and thus avoid arrest, and the giving of such a pass was common practice in the department and wholly within the regulations. As will be discussed later, Mr. Steinberg's concern for the welfare of this young lady proved to be a most potent weapon for the INS agents in their pressure campaign to entice Mr. Steinberg into an illicit scheme.

The authorities to whom the INS agents reported apparently decided that an opportunity to catch a well-known chain of restaurants in criminal activity might be presenting itself. They fitted Agent Volpe with a recording device and instructed him to go out and "play a crooked cop". Play

one, he did. He and his colleagues commenced a "blitz" campaign against Brew Burger restaurants, orchestrated with an unremitting effort to seduce Mr. Steinberg and later Mr. Riese into some form of criminal wrongdoing.

In the months leading up to the arrest of the defendants, every contact between them and Agent Volpe was initiated by Volpe. This was true of both the April 29 and May 6 meetings described in the majority opinion. The May 6 meeting was recorded, so that there can be no dispute as to what was said. It merits a somewhat more detailed review than was given in the majority opinion. In the first place, it should be pointed out that Volpe and his partner Moskowitz went to the meeting with the specific and agreed intention of trying to get Steinberg to offer them money. When Mr. Steinberg joined Mr. Volpe, as the latter had requested, he said to him, "You know you really blitzed me there for awhile." Mr. Volpe's reply was:

Yeah. Well that's what we are here to talk to you about. See if we can slow that down somehow, you know.

During the conversation which followed, Volpe not only repeatedly emphasized the damage which the agents could cause to the Brew Burger chain and its employees but managed also to work the conversation around to Steinberg's girlfriend. When informed by Steinberg that she had a weak heart, Volpe's response was:

"A weak heart? Or a broken one if she gets sent back." To complete the unlovely picture of what would happen to Steinberg's girlfriend if she was arrested and sent to the Brooklyn Navy Yard Immigration Jail, Volpe described her prospects in that institution as follows:

Over there when you cut somebody loose, the chances of a female getting screwed up over there is very good. . . .

These "investigative techniques", my colleagues say, were "certainly not improper".

---

1. "Q. Do we have it clearly, then, that when this was written you had never received an offer of a bribe from Mr. Steinberg or anybody else connected with this restaurant; right?

A. Yes, sir."

I most respectfully disagree. This was not investigation, it was instigation; and it sullies the good name of every conscientious law enforcement officer in the country to characterize it as proper.

When Mr. Riese appeared on the scene during the continuance of the agents' "investigation", they attempted to include him in their pressure tactics. Their efforts, and his response thereto, can be best portrayed by the following more complete excerpts from the tape recording which was being made:

Volpe: Yeah, that's it, so, so listen, you know we were blitzing, ya know, now I'm running the show at night so . . .

Steinberg: You are running the show?

Volpe: Yeah, see now we can, ah we can cool everything down completely, and you can keep whatever you want coming, you know, like . . .

Riese: Oh, I want, I wanna, I want to get them out of there, out of the stores, I, uh, I—I don't want them around. I don't want to be breaking any laws.

\*  \*  \*  \*  \*  \*

Volpe: Well listen, you said ya know, a couple of times you want to try and get rid of some of the bad guys and you want to rotate your good help out and around. Well that's why I came over, to have a few beers with you, to see if we can work something out about it, because like I said, now I am where I want to be. I am a honcho. There's no problem.

\*  \*  \*  \*  \*  \*

Volpe: Like you were saying, with your car, you park it anywhere, you know, you got the PD on your side, right? You talked about Lindsay and all that's fine. I don't even want to know about it, that's your gig, but a, ya know, if we can work things out where it is in a monetary situation, we don't have to worry no more. I don't think you know the guy who owns this place, he loses a little asset here, it's not gonna, it's not going to kill his pocketbook, help ours, not kill his.

\*  \*  \*  \*  \*  \*

Volpe: You know, in a monetary situation there is no problem. You can, you can, we can see you there somewhere in a place when we come and talk to you, so you talk to me, shake my hand, and it is all done. You take who you want and that's it, so that's it.

Steinberg: Money.

Riese: Yet you are worried about risking something and that's the worst thing.

Volpe: But that's the only thing that we can work.

Riese: The worst thing.

Volpe: That's the only way we can work it out though, there is no other way because it can't go any place, walk in and walk out, and not pay for a dinner or anything like that, it's impossible.

Moskowitz: Look, we have explored all the situations before you even came down here, otherwise we would have been coming down and taking people out.

Moskowitz: You guys, you guys are more or less . . .

Volpe: This, this is the only way because we can see this is the way it is done other places.

Moskowitz: We, we've got our jobs but, I have certain circumstances that put me in a situation where there's more things that I need.

Riese: What do you mean?

Moskowitz: I have been on this job roughly a year, two years, with IRS, it's good money as long as you are willing to live within the means. I am getting married, more or less, I want more for her than I can give her on my pay, not talking big money, you know.

Riese: I don't want you guys to think that ahh, I want favors and I am not going to come through on that because just like you have a lot to, you know, at stake, we have got an awful lot at stake, you know. I'm not naive. It came to my mind, the whole conversation, and I am really, I am very, very, very reluctant to do it.

Moskowitz: Yeah, we were also.

Volpe: You're reluctant! We are more reluctant than you. We talked about this

for a week now, you know, and like I proved to him, it works, that's all I can say and he can bear me out, he knows it works.

Moskowitz: We more or less guarantee results.

Volpe: You can keep on with it. You got to remember that your green card, that's a biggy, and we can do it, it can eventually be done. That's bigger than giving that piece of paper to you now. You know what I'm saying, because that's going through, like ahh, eight or ten channels where my name or his name is going to be on something and it's got to be golden on paper, otherwise, they are going to kick it back, we can make it golden.

Moskowitz: We know the setup of the Immigration Service, he better than I, he has been there longer, more or less, if you are, I am not saying you have to get crooked, more or less, if you know the angles.

Volpe: We are not being crooked.

Moskowitz: That's why guys run after lawyers. That's why this guy charges them $2,000, he knows the angles, the angles don't always work, but most of the time, if you know what you are doing, right, you get results.

\* \* \* \* \* \*

Volpe: Well how about the chain, like we were talking before, the chain itself has got to be worth it to you, so that you don't get botched up and kicked around all the time.

\* \* \* \* \* \*

Volpe: So you don't have to give us the money, give it to, you know, somebody else to give it to us, one of the, somebody you can trust, somebody you got, er confidence in, not even him.

\* \* \* \* \* \*

Riese: I would like not to be a part of that, I mean, I just have too much at stake to be a party to that.

\* \* \* \* \* \*

Moskowitz: You know, you know, what damage we do when we come in, right?

Steinberg: Yeah.

Volpe: You are going to know what it is worth to you?

Moskowitz: Can you put a monetary amount on it? What disruption it causes?

Volpe: It is up to you guys.

The majority opinion states that following the May 6 meeting Mr. Riese informed his supervisor of the agents' demand for money. In fact, he did more than that. He advised his supervisor that the demand would be refused. His exact language, as set forth in a letter, was as follows:

I expect Brewburgers to be hit very hard by immigration officials beginning Tuesday, May 13. On that date, Fred Steinberg and I will meet for a second time, and we will be refusing a certain deal that they wish to make. I expect they will be angry at our refusal, and there will be reprisals.

I quote this language to point up the tragedy of a citizen of our great country having to worry about the anger of a law enforcement officer, arising out of the citizen's refusal to pay a demanded bribe.

During the May 12 meeting between the agents and Steinberg, Volpe brought up the subject of green cards,[2] and Steinberg said that his girl might be willing to buy one. This, of course, is not surprising considering the glowing prospects for her future which the agents had painted. It was thereafter that the scheme was hatched wherein aliens would pay $1,000 to Volpe and Moskowitz in return for a green card. Mr. Steinberg did not want to get personally involved in this illicit transaction. He said, "I'll send the people to you. You guys can do whatever you want with them." The exact conversation which then ensued was as follows:

Volpe: Alright. We're gonna have to get somebody to sign these things. Somebody, somewhere along the line is gonna have to sign the labor certs. Be-

---

**2.** A "green card", Immigration Form I–151, is issued to every alien lawfully admitted into the United States for permanent residence. 8 C.F.R. § 101.3.

cause you want to make it legit. That's what I'm saying. This is gonna be strict legit. This isn't gonna be phony or nothing.

Steinberg: Yeah.

Moskowitz: We're doing it and we're playing the angles the way the lawyer would do, but we're playing it cheaper. Same thing a lawyer would do. So.

Volpe: Instead of having the lawyer get the labor cert, your attorney box, there's no name, you did it yourself. That's all, no big deal. (1-second UNINTELL.) But, uh, other than that, we're gonna make it totally legit.

Volpe: Brew and Burger is sponsoring twenty or ten, fifteen, or Brewery is sponsoring five, somebody else is sponsoring. 'Em all on the up and up.

Moskowitz: Whoever you can sign for yourself, you know what I mean?

Volpe: If we're signing them, and because they're gonna be labor certifications they gotta sign them. Somebody who's going to sponsor them, because when it gets reviewed, they're gonna say "This guy's getting a card and, er . ."

Steinberg: They'll have to get their own sponsors.

Volpe: Uh.

Steinberg: They have to get their own sponsors.

Volpe: For labor certification, they're gonna need ya know—well, they can ask you guys.

Moskowitz: If any of them are managers and such.

Volpe: A manager can't sign a labor cert for himself, being the manager of the place. See, we need an authorized agent's signature of a worker, not a worker, but one of the honchos in the place where he is gonna be employed.

Steinberg: Uh huh.

Volpe: See, like I said before, you get a mechanic washing cars. Some guy in a cab company signing for him, that's no good.

Steinberg: Yeah.

Volpe: If you people really want these people to work for you, there's no problem.

The most illustrative excerpt from this entire tape recorded the following whispered aside from Volpe to Moskowitz while Steinberg was temporarily absent:

Volpe: I'm trying to angle him. If we can get Dennis to sign we'll have all the people together and we want some of these guys there too. (Pause) A thousand dollars a green card, 20 people get twenty people at one time, we'll take it and bust them.

"I'm trying to angle him." This is a normal investigative technique of a conscientious police officer?

So that there is no question about the May 22 transaction, Mr. Riese did not "meet" with the INS agents; he lived only a few blocks away from a Brew Burger which was being blitzed and apparently happened by during the course of the raid. The majority opinion correctly quotes Mr. Riese's surprised reaction, even down to the four letter word, when he learned that money was going to be paid to the agents.

When Riese left, Volpe and Moskowitz gave Steinberg a ride to the lot where his car was parked. During the ride, Steinberg informed the agents that he himself intended to sign all the employment certification forms. Volpe then admonished him that there would be problems processing the applications if they were all signed by the same person. Believing the plan in jeopardy without Riese's participation, Steinberg responded, "Well, I'll just take care of it and I'll say Dennis, he doesn't want to get involved in anything not legal. So I'll say you just sign, these people came to you looking for a green card and you fill out the labor certification."

The following excerpt from Agent Volpe's testimony illustrates the entire tenor of the conversation between him and the defendants on that day:

Q. You wanted to make sure that these people knew that all of this was legal, didn't you? You wanted Mr. Stein-

berg and Mr. Riese to think that everything you were doing was legal, didn't you?

A. Yes, ma'am.

Volpe also admitted on cross-examination that prior to the May 22 meeting, the FBI had told him that more evidence was needed in order to inculpate Riese. The FBI instructed Volpe to try to get Riese to sponsor the illegal aliens by signing labor certification cards, and this apparently motivated Volpe to tell Steinberg that the applications could not be processed if Riese did not sign some of the cards. Mr. Volpe was a successful advocate. Mr. Riese did sign several application forms although he knew that the applicants involved would be required to pay Agent Volpe $1,000. One of the applicants testified that Riese told her he did not want to get involved. Another testified that Riese told him he didn't want to do it but would do it to help him. Mr. Riese told the same applicant that this was "not a right thing to do."

The following tape recorded exchange between Volpe and Moskowitz following their delivery of the green card to Steinberg's girlfriend at the Commodore Hotel appropriately brings their "investigative" activities to a close:

Volpe: They got ripped off?

Moskowitz: Yea, I feel like a Judas.

. . .

They got "ripped off"! By whom? By two representatives of the United States Department of Justice. 8 U.S.C. § 1101(a)(34).

In *United States v. Archer*, 486 F.2d 670, 676–77 (2d Cir. 1973) we said:

[T]here is certainly a limit to allowing governmental involvement in crime. It would be unthinkable, for example, to permit government agents to instigate robberies and beatings merely to gather evidence to convict other members of a gang of hoodlums. Governmental "investigation" involving participation in activities that result in injury to the rights of its citizens is a course that courts should be extremely reluctant to sanction. Prosecutors and their agents naturally tend to assign great weight to the societal interest in apprehending and convicting criminals; the danger is that they will assign too little to the rights of citizens to be free from government-induced criminality. (Footnote omitted).

In *United States v. Toscanino*, 500 F.2d 267, 275 (2d Cir. 1974) we went a step further and said that due process "extends to the pretrial conduct of law enforcement authorities." In *Hampton v. United States*, 425 U.S. 484, 96 S.Ct. 1646, 48 L.Ed.2d 113 (1976), the Supreme Court refused to extend this rule to an entrapment case where the government supplied the illegal drugs and the "police, the government informer, and the defendant acted in concert with one another." *Id.* at 490, 96 S.Ct. at 1650. This, however, is not such a case. If there was a concert here, the government agents were the conductors and the defendants responded to their persuasive batons. I cannot vote to affirm a conviction based on such governmental activities, and, if I read *Hampton* correctly, I do not believe that the majority of that court would. *See, e.g., Sherman v. United States*, 356 U.S. 369, 78 S.Ct. 819, 2 L.Ed.2d 848 (1958).

Were I not voting to reverse both convictions, because of the misconduct of the government's agents, I would nonetheless vote to reverse as to the defendant Riese because the Government has failed as a matter of law in sustaining its burden of proving criminal predisposition on his part. *See United States v. Klosterman*, 248 F.2d 191, 195 (3d Cir. 1957). The majority washes away Riese's continued expressions of unwillingness by saying that "he may simply have been worried at the thought of money bribes and the increased risk of being caught." The answer to this argument is that lack of predisposition is not dependent upon the motive which brings it into being. The very reasons which the majority derides, predispose many of our citizens to walk the straight and narrow path.

Rather than extend this discussion to undue length, I will simply conclude with a quote from one of the last taped conversa-

tions between Steinberg and Volpe which preceded the defendant's arrest:

Steinberg: Listen, I've got a problem. I signed my half, Dennis was reluctant to sign his.

Volpe: Hmmmm.

Steinberg: And thirty seconds ago I convinced him that he had better sign them.

If this quoted language accurately describes predisposition, then perhaps Webster should cease using "inclination" as its synonym.

I vote to reverse the judgments of conviction and to dismiss the indictments.