## UNITED STATES v. SHERMAN.

### No. 29, Docket 22392.

United States Court of Appeals
Second Circuit.

Argued Nov. 3, 1952.

Decided Dec. 16, 1952.

Henry A. Lowenberg, New York City, for appellant.

Mortimer C. O'Brien, White Plains (Myles J. Lane, U. S. Atty. for Southern District of New York, New York City, Thomas F. Burchill, Jr., and Harold J. Raby, Asst. U. S. Attys., New York City, of counsel), for appellee.

Before SWAN, Chief Judge, and L. HAND and FRANK, Circuit Judges.

L. HAND, Circuit Judge.

This is an appeal from a judgment of conviction under an indictment in three counts for selling narcotics,[1] each in identical words except that they laid the sales at different dates: i.e., that the accused "did·

1. § 174, Title 21, U.S.C.A.

receive, conceal, sell and facilitate the transportation, concealment and sale" of heroin. The evidence proved beyond dispute that Sherman, the accused, on three separate occasions—November 1st, November 7th and November 16th, 1951—sold heroin to one, Kalchinian, whom the "Bureau of Narcotics" had employed as a decoy to make a case against him; and his only defence was, and is, that he was "entrapped" to commit the crimes. That issue the judge left to the jury over Sherman's objection that the "entrapment" had been proved. Sherman did not take the stand, and the only proof of the sales was the testimony of Kalchinian, who swore that he had been an addict to the drug and that, when he made the purchases from Sherman, he was under criminal charges for having dealt in narcotics unlawfully. Moreover, when he bought, he was acting as an agent of the Bureau of Narcotics, and it was his job "to go out and try to induce a person to sell narcotics." During the autumn of 1951 he had been a patient of a Dr. Grossman who was treating him to rid him of the habit, and it was in Grossman's office that he met Sherman, who was also an addict and a patient of Dr. Grossman on the same quest. The two became acquainted in this way, but nothing took place between them that was relevant until after several interviews. On one occasion, when they were both at the same pharmacy to get their prescriptions filled, Kalchinian asked Sherman "what his experiences had been when he was using narcotics and he told me, and I asked him then where he was getting it and the quality of the narcotics he had been purchasing and he told me." He said he had been getting "fairly good quality * * * from a fairly good-sized operator and I asked him whether I could meet the man." Sherman answered that this would be difficult because the "man" was going out of the business; but finally, in answer to Kalchinian's question whether there was "any possible chance for you to buy it from this man," Sherman said that he could do so. Kalchinian then asked how small a dose he could get and they agreed that Sherman should buy one-sixteenth of an ounce and split it with

Kalchinian, who "asked him to try and do that, and asked him if I could get in touch with him. He didn't encourage me, he didn't tell me. He said he would call me and I gave him my phone number * * * and he promised to call me there." After two or three calls to tell Kalchinian that he had not been successful, Sherman finally rang him up about the first of September and they arranged upon a meeting, at which Sherman told him that he had bought a quantity of the drug—presumably one-sixteenth of an ounce—for $25 which he would divide, if Kalchinian paid him $15.00 —$12.50 for the half delivered, and $2.50 for cab fare and his trouble. That was the first sale and the second, which took place about a week later, was precisely like it: that is, Sherman again called him up and arranged for a meeting where Sherman's purchase was divided between them. Neither of these sales was among those charged in the indictment. Having in this way started a course of buying, the agents of the "Bureau of Narcotics" arranged that the next time Sherman should ring up to fix a meeting, some of their number should be nearby, and the customary procedure should be set going: the preliminary search of the decoy, the delivery of marked money to him and upon his return from the purchase an immediate search of his person for the drug. The testimony would justify a finding that the sales in the indictment were made in performance of an understanding between the two that, as Kalchinian was likely from time to time to be in need of heroin and as Sherman was likely from time to time to be able to supply his needs, he should ring up Kalchinian whenever he learned that a new supply was available and inquire whether Kalchinian had any use for it. Kalchinian was of course free to put an end to this arrangement but it was in force at the time of each of the sales in question.

Before the decision in 1932 of the Supreme Court in Sorrells v. United States, 287 U.S. 435, 53 S.Ct. 210, 77 L.Ed. 413, there had been a good many decisions in the lower federal courts that there were occasions on which it was a defence to an indictment that agents of the United States

had induced the accused to commit the offence charged. Nevertheless it is the two opinions in that case that have become the authoritative exposition of the doctrine in lower federal courts, for the Supreme Court has not said anything since then to qualify them. Therefore, we shall not go over the earlier authorities, but will start with what was there laid down. Two views emerged: the minority thought that procurement of the offence by an agent of the prosecution was always a defence without more; the majority thought that there were occasions on which it might be legitimate. However, the majority did not try to lay down what those occasions were beyond saying—287 U.S. at page 451, 53 S.Ct. at page 216—that "the predisposition and criminal design of the defendant are relevant"; and that "the controlling question" is "whether the defendant is a person otherwise innocent whom the government is seeking to punish for an alleged offence which is the product of the creative activity of its own officials." The only instance in which we have ourselves attempted to define the meaning of these phrases was United States v. Becker, 2 Cir., 62 F.2d 1007, 1008, decided in 1933, where we suggested three excuses for an inducement: "an existing course of similar criminal conduct; the accused's already formed design to commit the crime or similar crimes; his willingness to do so, as evinced by ready complaisance." Although there have been a good many later decisions, the opinions have usually contented themselves with discussing the evidence then at bar without attempting any generalization; but they have left the subject in an uncertainty that is undesirable if it can be avoided. In Sorrells v. United States, supra, all the Court agreed as to the meaning of inducement: it was that someone employed for the purpose by the prosecution had induced the accused to commit the offence charged, which he would not have otherwise committed. That was a defence, to which, if proved, the minority thought there was no reply, but to which the majority thought that there was, and obviously we must accept that view. Indeed, it would seem probable that, if there were no reply, it would be impossible ever to secure conviction of any offences which consist of transactions that are carried on in secret. On the other hand there are difficulties in knowing what should be a valid reply. As we understand the doctrine it comes to this: that it is a valid reply to the defence, if the prosecution can satisfy the jury that the accused was ready and willing to commit the offence charged, whenever the opportunity offered. In that event the inducement which brought about the actual offence was no more than one instance of the kind of conduct in which the accused was prepared to engage; and the prosecution has not seduced an innocent person, but has only provided the means for the accused to realize his preexisting purpose. The proof of this may be by evidence of his past offences, of his preparation, even of his "ready complaisance." Obviously, it is not necessary that the past offences proved shall be precisely the same as that charged, provided they are near enough in kind to support an inference that his purpose included offences of the sort charged.

On the argument the prosecution suggested that the conviction might be supported because of the allegations in the indictment that Sherman had "received" and "concealed" heroin, as well as sold it. To that we answer that, as to that part of the drug which he sold to Kalchinian, Kalchinian induced Sherman's receipt and concealment of it as much as his sale of it. As to that part which Sherman kept for his own use, it might be difficult to say as much, for Kalchinian was not interested in anything but the purchase; yet we should long hesitate to affirm a conviction on such a theory, for the prosecution throughout the trial treated the offence as consisting only of the sales. But we are spared any nice distinctions, for the judgment entered was only for selling heroin, and was therefore limited to the theory on which the trial was conducted.

Therefore in such cases two questions of fact arise: (1) did the agent induce the accused to commit the offence charged in the indictment; (2) if so, was the accused ready and willing without persuasion and was he awaiting any propitious opportunity to commit the offence. On the first question the accused has the burden;

on the second the prosecution has it. In the case at bar plainly Kalchinian did induce the first sale, but that was irrelevant, unless at that time the two had made the agreement described above. If they did, it would be true that the later sales resulted from Kalchinian's original inducement for it meant that he was in the market, so to say, and might buy whenever Sherman had any heroin to offer. Although, as we have said, on that issue Sherman had the affirmative the evidence to support the defence was ample, if indeed not conclusive. On the other hand since the prosecution had the burden upon the issue of the excuse for inducement, it had to satisfy the jury that Sherman did not need any persuasion; but that he stood ready to procure heroin for anyone who asked for it; and the evidence scarcely supported such a finding. So far as appeared, Sherman shared his heroin with Kalchinian as a fellow addict, and without profit. That was no evidence that he was in the habit of dispensing heroin, any more than his habit of buying it illicitly for himself or than the furtive way in which he wrapped up the heroin. We need not however decide that the refusal to direct a verdict required a dismissal of the indictment, because there must be a reversal anyway, and upon a new trial there may be other evidence of Sherman's dealings in narcotics. Moreover, even though the motion should have been granted, we are not bound to dismiss the indictment.[2] It is enough to demand a reversal of the conviction that the case was left to the jury upon an erroneous statement of the law. The judge concluded his colloquial charge by telling the jury to ask themselves whether the "Government" had procured the commission of the crime "through trickery, or fraud of the officer, or undue persuasion," or whether what it did was "merely (to) afford an opportunity for the commission of a crime where the latent intent existed to commit the crime." Wheth-

er the second alternative would have saved the charge we need not say, for in any event the jury did not understand what they were to decide, and after about half an hour came back and asked to have the charge read again. That was done, but the judge thereupon undertook to restate the law to them, concluding as follows: "the law says you can't trick anyone into it by artifice or fraud such as giving a fabulous offer, or telling somebody that you are in excruciating pain and you must have it; or some such inducement that would put the idea into somebody's head where it never existed before." With those as the last words on the subject the jury retired and came back almost at once with a verdict of guilty. So far as concerns the defence—*i.e.*, the inducement—it was complete without "trickery" or "fraud"; it includes soliciting, proposing, initiating, broaching or suggesting the commission of the offence charged. If the prosecution sees fit to set the accused in motion, it is called upon to make good its excuse. So much was certainly wrong. Nor was this cured by the alternative which, if it was to be a cure at all, had to state the excuse. We are not sure whether "the idea" that must not have "existed before" in "somebody's head"—we assume this meant the accused's—was the "idea" of committing the particular offence charged. If so, it added nothing to "inducement" simpliciter. If, however, the judge meant by "the idea" a disposition to commit offences like that charged, he surely did not make it plain and the error was not corrected. On no view can we find that the cause was presented to the jury in such terms that they could apply the law as we understand it; and the error, which went to the very heart of the prosecution, was grave enough to be noticed, although the defence had not excepted to it. Fed.Rules Crim.Proc. rule 52(b), 18 U.S.C.A.[3]

Judgment reversed; new trial ordered.

2. United States v. Norton, 2 Cir., 179 F. 2d 527; United States v. Coplon, 2 Cir., 185 F.2d 629.

3. Screws v. United States, 325 U.S. 91, 107, 65 S.Ct. 1031, 89 L.Ed. 1495; United States v. Pincourt, 3 Cir., 159 F.2d 917; United States v. Rappy, 2 Cir., 157 F.2d 964, 967.

Brotherhood of Carpenters and Joiners v. United States, 330 U.S. 395, 411, 412, 67 S.Ct. 775, 91 L.Ed. 973; United States v. Pincourt, 3 Cir., 159 F.2d 917; United States v. Rappy, 2 Cir., 157 F.2d 964, 967.