**UNITED STATES of America, Appellee,**

v.

**Rosa ORTIZ, Defendant-Appellant.**

**No. 760, Docket 73-2523.**

United States Court of Appeals, Second Circuit.

Submitted Feb. 14, 1974.

Decided May 6, 1974.

Richard Wile, Asst. U. S. Atty., New York City (Paul J. Curran, U. S. Atty., for the S. D. N. Y., and S. Andrew Schaffer, Asst. U. S. Atty., New York City, on the brief), for appellee.

Jay Gold, New York City, for defendant-appellant.

Before MEDINA, MANSFIELD and OAKES, Circuit Judges.

MEDINA, Circuit Judge:

Having been convicted by Judge Gurfein, sitting without a jury, of the crime of conspiracy to distribute a narcotic drug in violation of 21 U.S.C., Section 846, Rosa Ortiz appeals. The claim that she was merely a "procuring agent" is precluded by our recent decision in United States v. Masullo, 489 F.2d 217 (2d Cir. 1973).

Ortiz testified in her own defense and there was at the trial a direct conflict of credibility between her testimony and that of the witnesses for the prosecution. As the trier of the issues of fact, Judge Gurfein did not believe Ortiz and he found as a fact beyond a reasonable doubt that Ortiz and her co-defendant had demonstrated "a willingness and predisposition to committing the crime." This disposed of the claim that entrapment was established as a defense as a matter of law.

It is of no more than peripheral significance that it was by mere chance that the narcotics agents spoke with Ortiz when they came to the apartment to talk with the husband, who was suspected of dealing in narcotics. And the same is true of the time interval between the first interview with Ortiz and the ultimate transaction for the purchase of an amount of heroin much larger than the one originally mentioned by the government agent.

We quote Judge Gurfein's detailed findings of fact on the question of entrapment:[1]

"When Thomas Kinsey first brought Agent Franklin to Ortiz's apartment under the pretense of setting up a narcotics sale with one Manny Macia, Ortiz offered no objections. And when Franklin asked Ortiz whether she could sell him an ounce of heroin, Ortiz replied without hesitation that she could. When asked about supplying an eighth of a kilo, she replied "I would have to ask my husband or Manny Macia. If you would like, you could return this evening to buy the ounce." Finding Ortiz so willing to supply the heroin, Franklin chose not to buy the ounce, but to wait until she procured a larger quantity. Thus, over the

---

1. References to the trial transcript are omitted.

next five weeks he called her a total of five times inquiring whether Ortiz had contacted her supplier. On December 1, Ortiz informed Franklin, in the course of one of these phone calls, that the heroin would be available.

In the interim, Carmen Torres had come to live with Ortiz. Ortiz testified that a few days after Torres had started living there, she informed Torres about Franklin's request for heroin. Initially Torres "just let it drop" but afterwards "Carmen [Torres] said that she was going to see if she could find somebody." Torres' willingness to become involved occurred prior to any contact Torres had with Agent Franklin. On December 2, when Franklin called Ortiz's apartment Torres answered the phone, identified herself as "Gloria" and told Franklin "we haven't heard from our guy yet but I'm going to see him tonight." Subsequently Oritz's phone was disconnected.

On December 4 Franklin appeared in person at Ortiz's apartment, but left after only a brief discussion with Ortiz because Ortiz's sister-in-law was present. When Franklin returned two days later, he brought along Agent Rottinger. Franklin and Rottinger proceeded to drive defendants Torres and Ortiz to their supplier, with Torres directing the route. The defendants descended the car and left the Agents' view. It was Ortiz's testimony that she had never met the supplier before and that it was Torres who knew him to be a narcotics dealer. After a few minutes the defendants returned, quoting a price of $1,600 for three ounces. After they returned to the apartment, Franklin advised Torres that he would not have the money until the next day. Torres then asked to be driven back to make new arrangements. After driving her back to the same place, Torres descended and returned with the report that Franklin could have three ounces of heroin for $1,600 and an eighth of a kilo of cocaine for an additional $2,000. Franklin agreed. They drove back to Ortiz's apartment.

The following day, December 9, Franklin returned to the apartment. Torres asked for the money and Franklin asked to see "the stuff." Torres retrieved a sample of heroin. Franklin thereupon left the apartment, went downstairs and returned with $4,000 and Special Agent Reilly. One Nelson Garcia then emerged from the bedroom with a glassine envelope in one hand and a white paper bag in the other. The defendants were then placed under arrest."

We see no basis whatever for rejecting any of these findings.

Affirmed.

OAKES, Circuit Judge (dissenting):

With due respect to my brethren and the trial judge, I believe that the Government has failed to meet its burden of proving beyond a reasonable doubt that appellant Ortiz was predisposed to commit the crime which the Government induced her to commit. Accordingly, I would reverse.

In this circuit entrapment is a bifurcated defense, requiring a defendant to demonstrate that he has been induced to commit the crime by the Government; if he does, then the Government is required to prove beyond a reasonable doubt that the defendant was predisposed to commit the crime. United States v. Rosner, 485 F.2d 1213, 1221–1222 (2d Cir. 1973), petition for cert. filed, 42 U.S.L.W. 3474 (U.S. Jan. 7, 1974) (No. 74–1062); United States v. Riley, 363 F.2d 955, 957–958 (2d Cir. 1966); United States v. Sherman, 200 F.2d 880, 882–883 (2d Cir. 1952) (L. Hand, J.). See also United States v. Russell, 411 U.S. 423, 93 S.Ct. 1637, 36 L. Ed.2d 366 (1973). The defendant's burden of demonstrating inducement by the Government does not require a showing of trickery or fraud or even the degree of pressure exerted, see United States v. Riley, 363 F.2d at 958, but rather includes the showing of mere "soliciting, proposing, initiating, broaching or suggesting the commission of the offence [sic] charged" by the Government. United States v. Sherman, 200 F.2d at

883. Here the offer by the Government agent to buy narcotics is sufficient evidence of inducement to shift the burden to the Government to prove beyond a reasonable doubt that Ortiz was predisposed to sell narcotics.

The evidence of such predisposition or propensity will generally be circumstantial of necessity, and there is no magic formula for deciding when predisposition was present and when not. In each case that conclusion, normally made by the jury but here by the judge in a trial without jury, must rest upon all the facts in the case. There is, perhaps, no better guide to the weighing of those facts than the language of Chief Justice Hughes in Sorrells v. United States, 287 U.S. 435, 451, 53 S.Ct. 210, 216, 77 L.Ed. 413 (1932):

> the issues raised and the evidence adduced must be pertinent to the controlling question whether the defendant is a person otherwise innocent whem the government is seeking to punish for an alleged offense which is the product of the creative activity of its own officials.

In this case, accepting the Government's evidence as true, only one fact supports at all the proposition that Ortiz was predisposed to sell narcotics, while all the other evidence, either presented by the Government or uncontradicted by it, supports the opposite conclusion: that Ortiz was an innocent person without criminal motivation or intent until the Government agent first offered temptation and then repeatedly presumed upon her to become involved in a criminal enterprise which never would have existed without the Government's creative and active force. But, as pointed out, the burden was on the Government to prove *beyond a reasonable doubt* that Ortiz had such a criminal predisposition.

The only evidence supporting the Government's position was testimony by the agent that when he asked Ortiz if she could sell him an ounce of heroin, she said she "could" if he came back that night.[1] Failure to demonstrate any reluctance may indeed be evidence of predisposition,[2] but it can hardly be treated as conclusive. *See* United States v. Sherman, 200 F.2d at 882.

The evidence to the contrary is substantial. First, there is no evidence whatever that Ortiz had any previous criminal dealings in drugs, or even that the agent thought she had. Rather the agent, who had gone to the apartment to meet a certain Manny Macia or Ortiz' husband,[3] after waiting a half hour for them, only then asked Ortiz a mother of two on welfare, if she could sell him an ounce of heroin. She did not even say she could supply the ounce immediately; rather, she asked the agent to return that evening. When asked about an eighth of a kilo (4.4 ounces), she could only say, "I don't know. I would have to ask my husband or Manny Macia." Dur-

---

1. We are bound to view the evidence in the light most favorable to the Government, United States v. Smalls, 363 F.2d 417, 418 (2d Cir. 1966), cert. denied, 385 U.S. 1027, 87 S.Ct. 755, 17 L.Ed.2d 675 (1967), but it must be noted that Ortiz denies that she agreed to supply the agent with any heroin, and it is a fact that the agent did not return that night, but rather spent five weeks telephoning Ortiz, importuning her to provide him with narcotics.

2. It may also be evidence of lack of experience in the narcotics trade, in which, from this judge's experience in dealing with these cases, it seems unusual for a seller readily to admit his capacity to a complete stranger. In this case, to be sure, a heroin dealer, Kinsey, brought the federal agent the first time to the Ortiz apartment but for the purpose of meeting one Macia or Alberto Ortiz, appellant's husband. A half hour after arriving at the Ortiz' Bronx apartment, Kinsey left the apartment to move the Ortiz car. During Kinsey's absence the conversation took place in the course of which the agent asked Ortiz if she could sell him an ounce of heroin and, according to the agent, she replied that she could.

3. Neither the Government nor the majority opinion suggests that the fact that Ortiz' husband was apparently in the drug trade, or in jail as a result of being in it, is circumstantial evidence of *her* predisposition.

ing the *next five weeks* the agent, trying to set up a sale made five or six calls to Ortiz, all of which were unsuccessful. Indeed, Ortiz herself was not able to find anyone to sell her the heroin. Rather it was her subsequent roommate, Carmen Torres, to whom she had confided the agent's offer, who set out to find and did finally find a source for the requested heroin. In December, with no sale yet set up, Ortiz' phone was disconnected, hardly a sign of the affluence of a heroin dealer, but the agent was not disheartened; he went to Ortiz' home. Still nothing was finalized. Only when the agent returned two days later did Ortiz and Torres have him drive them to another part of the Bronx for "firm negotiations." The "deal" was set for five o'clock that day, but when the agents could not get the $1,600 for the three ounces ultimately agreed upon, it was Torres alone who drove with them to the Bronx again to arrange for a new deal, and it was with Torres alone that the agent arranged for an eighth of an ounce of cocaine to be added to the deal. Finally, the next day, the agents came to Ortiz' and Torres' apartment, where Torres answered the door, asked them if they had the money, and then showed them some of the narcotics. Ortiz was in the apartment and arrested along with Torres and two men, who with Torres had brought the narcotics to the apartment.

Upon these facts the Government, it seems to me, has failed to prove beyond a reasonable doubt that it had not corrupted an innocent person who had no propensity or predisposition to commit the crime. In Sherman v. United States, 356 U.S. 369, 78 S.Ct. 819, 2 L. Ed.2d 848 (1958), the Supreme Court overturned a guilty verdict because on the facts proved by the Government it had failed to satisfy that burden, so that as a matter of law the defendant was entitled to a verdict of not guilty. *Sherman* too involved heroin sales, but in *Sherman* the defendant made a number of sales over a time to the informer. Here there was one sale, and that not a large one. In *Sherman* the informer had no reason to suspect the defendant, but rather chose him because of his situation as an apparent addict to try to involve him in a narcotics sale. Here the agent had no reason to suspect Ortiz, but rather, after waiting in vain for those he did suspect, chose to try to involve Ortiz merely because she was there. In *Sherman* the informer capitalized upon the defendant's known weaknesses and sympathies to overcome any resistance to making the sale. Here Ortiz' position as a destitute mother of two who, because her husband was in jail, was forced to exist on her $62.50 per week welfare check, would obviously provide little resistance to the temptation of an offer of big money for coming up with a little heroin. In *Sherman* the informer was forced to prevail on the defendant over a period of time to effect a sale; here the agent for five weeks was unable to make even a relatively small purchase from Ortiz despite repeated entreaties. In *Sherman* there was evidence of the defendant's prior sale and possession of narcotics. Here there was none; at most, she said she "could" supply the agent with an ounce. In *Sherman* the defendant acted on his own without aid; here Ortiz was unable on her own to find a source, indicating a lack of experience, knowledge or motivation, and Torres, not Ortiz, played the major role in the actual transaction which finally did take place with the agents.

In short, the evidence did not indicate that Ortiz was a heroin dealer from whom the agents merely made a purchase; rather it indicates that the agent provided the idea to a poor mother, whose husband was in jail, how to make a large—to her—sum of money by selling something that probably anyone in her neighborhood could find if he tried. . Or, in the words of Sherman v. United States, 356 U.S. at 372, Ortiz was not an "unwary criminal" but an "unwary innocent," and "Congress could not have intended that its statutes were to be enforced by tempting innocent persons

into violations." The words of Circuit Judge Sanborn in the case of Butts v. United States, 273 F. 35, 38 (8th Cir. 1921), quoted with approval by the Court in *Sorrells*, 287 U.S. at 444–445, are, to my mind, directly applicable here:

The first duties of the officers of the law are to prevent, not to punish crime. It is not their duty to incite to and create crime for the sole purpose of prosecuting and punishing it. Here the evidence strongly tends to prove, if it does not conclusively do so, that their first and chief endeavor was to cause, to create, crime in order to punish it, and it is unconscionable, contrary to public policy, and to the established law of the land to punish a man for the commission of an offense of the like of which he had never been guilty, either in thought or in deed, and evidently never would have been guilty of if the officers of the law had not inspired, incited, persuaded, and lured him to attempt to commit it.