**UNITED STATES of America,
Plaintiff-Appellee.**

v.

**William M. ORDNER, Jr.,
Defendant-Appellant.**

**No. 592, Docket 76–1428.**

United States Court of Appeals,
Second Circuit.

Argued Jan. 4, 1977.

Decided April 18, 1977.

---

James A. Moss, Asst. U. S. Atty., New York City (Robert B. Fiske, Jr., U. S. Atty., Audrey Strauss, Asst. U. S. Atty., for the Southern District of New York, New York City, of counsel), for plaintiff-appellee.

Charles J. Irwin, Newark, N. J., for defendant-appellant.

Before MOORE, OAKES and TIMBERS, Circuit Judges.

MOORE, Circuit Judge:

Appellant William M. Ordner, Jr., is a licensed commercial blaster and firearms manufacturer. On March 2, 1976, he was charged in a six-count indictment with various violations of the Gun Control Act of 1968.[1] At his trial before Honorable Robert J. Ward, *United States District Judge* for the Southern District of New York and a jury, Ordner presented a defense based on entrapment and duress. The jury convicted him on Counts One through Three and acquitted him on Counts Five and Six.[2] The counts of the indictment on which Ordner was convicted are, in substance "ONE", unlawful possession "wilfully and knowingly" of a firearm, namely, a .25 caliber "Pen Gun" not bearing a required serial number; "TWO" unlawful transfer of said "Pen Gun"; and "THREE" unlawful possession of 502 .25 caliber "Pen Guns" (26 U.S.C. §§ 5842, 5845(a), (e) and (j), 5861(e) and (i) and 5871). Judge Ward sentenced Ordner to ten-year terms on each of the three counts, the sentences to run concurrently, subject to modification after a 90-day study to be conducted pursuant to 18 U.S.C. § 4205(c) and (d).

Ordner appeals on the grounds, *inter alia*, that the facts make out a case of entrap-

---

1. Counts One and Three charged that Ordner illegally possessed one unserialed pen gun and 502 unserialed pen guns, respectively, in violation of 26 U.S.C. §§ 5842, 5845, 5861 and 5871. Counts Two and Four charged that Ordner illegally transferred one unserialed pen gun and 502 unserialed pen guns, respectively, in violation of 26 U.S.C. §§ 5811, 5812, 5845, 5861, and 5871. Count Five charged that Ordner illegally possessed three hand grenades, in violation of 26 U.S.C. §§ 5845, 5861 and 5871. Count Six

charged that Ordner illegally transferred these grenades, in violation of 26 U.S.C. §§ 5811, 5812, 5845, 5861 and 5871.

2. Judge Ward dismissed Count Four at the close of the Government's case. Although he denied appellant's motion to dismiss Count Three, he stated that he would "hereafter treat [it] as charging aiding and abetting in the unlawful possession" of the 502 pen guns.

ment as a matter of law, that it was not illegal to "aid and abet" the non-criminal possession of firearms by Government agents, and that the jury verdict was inconsistent. We find these and appellant's other arguments to be without merit and hence we affirm his conviction.

### FACTS

Ordner met John Romano at a gun show in Connecticut in August, 1975. Ordner had not seen Romano for some time and informed him that he was now a commercial blaster. Romano told Ordner that he knew of a contractor who might have blasting work for him.

Unbeknownst to Ordner, Romano was at this time a Government informer. He had been arrested by Special Agent Joseph Kelly of the Bureau of Alcohol, Tobacco and Firearms on gun violation charges and had agreed to provide the Bureau with information in the hope that this might ameliorate any sentence he might subsequently receive. Romano told Kelly about his meeting with Ordner, and Kelly then asked Romano to bring Ordner to the home of Anthony Stagnito, a/k/a A. Michael Stagg. Stagg was a paid informant who resided in an expensive home in Armonk, New York.

Romano contacted Ordner and made arrangements for him to meet the "contractor" whom Romano had mentioned at their earlier meeting. On August 25, 1975, Romano drove Ordner from Connecticut to New York. He stopped the car at a phone booth and made a phone call. A Cadillac with a driver named "Billy" (actually Police Officer William Adams) arrived and the men proceeded in that car, by a circuitous route, to Stagg's home.

Ordner and Romano entered the house and were met by Stagg, Kelly, and another Special Agent, who were introduced respectively as "Mr. S", "Joe Keen", and "Mr. S's bookkeeper". When Ordner asked about the blasting work, "Mr. S" responded that he did not need a blaster. The facts are in dispute at this point. Agent Kelly testified that "Mr. S" told Ordner that the "family" was looking for weapons to sell and that Ordner replied that he had dealt in weapons but would have to re-establish his contacts. Ordner testified that "Mr. S" merely declared his intention to "make good business" with him.

Shortly thereafter, Romano died of a liver ailment. On September 23, 1975, Ordner met Stagg, Kelly, and Adams after the wake, and was offered Romano's place in the "family". Kelly and Ordner both testified to several meetings which took place over the next month, but their versions differed. Briefly, Kelly testified that Ordner said he could supply the "family" with a large number of pen guns, that he supplied them with a blueprint and a sample,[3] that he showed them how to operate the guns, that he helped locate a supplier of one of the component parts, that he supplied the other part himself, and that he helped assemble 502 pen guns from the two component parts.[4] Kelly testified further that Ordner offered on more than one occasion to supply the "family" with other types of guns; the Government introduced a tape recording of one such conversation between Ordner and Kelly.[5]

Ordner's version of these meetings was that he initially refused to supply the guns in quantity but when pressed, volunteered the names of possible suppliers. He never "offered" to supply other types of guns,

---

**3.** This sample pen gun is the gun Ordner is charged with possessing and transferring in Counts One and Two, respectively, of the Indictment. A pen gun is in shape somewhat similar to a large fountain pen. It can be assembled apparently by taking the propulsion mechanism of a "flare gun"—a gun frequently used by mariners for distress signal purposes. By adding a machined barrel thereto, the flare can be converted into a single shot weapon.

**4.** Count Three, as amended, charged Ordner with aiding and abetting the possession of these 502 pen guns; Count Four, which charged Ordner with transferring these guns, was dismissed.

**5.** Appellant's objection to the admission of this tape recording into evidence is without merit. The tape was clearly relevant to the issue of appellant's predisposition.

although again, when pressed, gave information on and demonstrated other types of guns. Ordner testified that he was "pressed" in indirect, as well as direct ways. "Mr. S" questioned him about his family and cautioned him not to go to the authorities. Romano's death added to the aura of fear surrounding the "family". Ordner's daughter told him that unknown men had tried to get her into their car. Two of Ordner's friends testified to conversations they had with Ordner during this period, in which he expressed his fear and in which he said that he thought he had been approached by the mob. Finally, Ordner testified that on September 25, 1975, he tried to call the United States Attorney but was unable to get through and did not leave a message.

## ENTRAPMENT, COERCION AND DURESS

Were it not for statements by Government counsel and its chief witness, Special Agent Joseph F. Kelly, Bureau of Alcohol, Tobacco and Firearms, this case might be placed in the usual jury verdict category. However, the extraordinary and quite bizarre factual background has caused the reviewing court to examine the record with microscopic care in order properly to appraise the defense of entrapment as a matter of law.

The record does not disclose any reason for believing that Ordner was under suspicion as a lawbreaker, actual or potential. Nor is there any proof that he was under surveillance of any kind or for any purpose. To the contrary, he appears to have been a family man with a wife and children conducting his trade as a professional blaster. The scenario which the Government writes is rather indicative of attendance by its Agents at a recently popular motion picture portraying the activities of the underworld, headed by their chieftain.

Onto the stage first enters John Romano, "an individual [Kelly] arrested for gun violation charges" and who had "indicated he wanted to try to help us [the Government] so that any help he could render to us

would be supplied to any sentencing Judge at the time of sentencing for his particular crime". The Bureau made him a "confidential informant". Obviously, to promote his own interests, Romano had to produce (or "get") someone, and apparently he selected his friend Ordner. The Government added to its cast Anthony Stagnito (Stagg), a "paid informant" who had a large (7 bedrooms, $200,000–$300,000 estimated value) house in Armonk (Westchester County), New York; Police Officer William Adams of the Town of North Castle; Special Agent Kenneth Waxman of the Bureau and other Agents who entered upon the stage at a later date.

Kelly, to carry out his part, assumed the name of "Joe Keen", Police Officer Adams became "Billy", Agent Waxman pretended to be Stagg's bookkeeper, even to the point of carrying an account ledger as a stage prop, and Stagg himself appeared in the style of the motion picture chieftain "Mr. S". As Government counsel best describes the situation in his summation:

> "the ruse, if you will, that was set up, was carried off in grand style. There is no denying that. And when Mr. Ordner arrived, the Government's agents were playing the role to the hilt to convince him [Ordner] that they could be trusted in a criminal enterprise, that they were the real thing [namely, members of a 'family' or 'mob']."

The conversation, in part, was "about the possibility that Mr. Ordner might supply Mr. Stagg's organization with explosives and firearms". (App. 607, 608).

The "ruse" was even carried further. When Romano suddenly died, Stagg revealed to Ordner that it was Romano's "dying wish" that Ordner succeed him as a member of the "family"—a wish that Stagg emphasized by kissing Ordner on both checks. And to take care of every detail of the deception, even the pseudo-butler serving the group was a Special Agent, as was another Agent stationed upstairs.

The thespian talents of this Kelly-directed task force were eminently successful. To them it was "a kind of an act" and "the

purpose of the act was to convince Mr. Ordner that Mr. Stagg was a big man in organized crime" (App. 197), and the "objective" was "[t]o get Mr. Ordner to supply him [Stagg] with some kind of firearm" (App. 198). Kelly, himself, said that he thought that Ordner's reaction could be taken to "indicate that he might believe we were part of organized crime . . . .". (App. 199).

But entrapment as a matter of law is not so easily disposed of.

 Even assuming that Romano, to stay in the Government's good graces, had to find a "victim" and that he reported to the Agents that he had found a possibility for them to ensnare, entrapment is a term of legal art and as a matter of law is not established, if, despite the enticement, the potential defendant shows himself ready and willing to commit the crime. *United States v. Sherman*, 200 F.2d 880, 882–883 (2d Cir. 1952); *United States v. Licursi*, 525 F.2d 1164, 1168 (2d Cir. 1975); *United States v. Viviano*, 437 F.2d 295, 298 (2d Cir.), *cert denied*, 402 U.S. 983, 91 S.Ct. 1659, 29 L.Ed.2d 149 (1971); *United States v. Weiser*, 428 F.2d 932, 934 (2d Cir. 1969), *cert. denied*, 402 U.S. 949, 91 S.Ct. 1606, 29 L.Ed.2d 119 (1971); *United States v. Riley*, 363 F.2d 955 (2d Cir. 1966). Therefore, whether or not the Government's initiation of the crime was established as a matter of law, we are left with the issue of Ordner's predisposition. The testimony of Ordner and Kelly conflicted on this crucial issue and the jury was entitled to believe Kelly's version of the facts.

Kelly testified that Ordner told him that he had been engaged in similar activities in the past, and that Ordner offered without hesitation to supply him with pen guns and other firearms. The jury could conclude that Ordner was a willing and indispensable party in every step of the "pen gun" operation. Ordner brought the blueprint and the original prototype. He suggested the sources from which to obtain the component parts of the pen guns and conducted most of the negotiations as to the purchase of these parts. Ordner then directed and as-sisted in the assembly of the five hundred pen guns, ten of which he personally fired.

The jury was not limited to Kelly's testimony in drawing the above conclusions. It listened to a tape on which Ordner unhesitatingly assisted in ironing out the plans for obtaining the pen guns and then negotiated the purchase of the flare components from a supplier of boating goods. The jury heard Ordner, on tape, mislead the supplier into thinking that Ordner was purchasing the flares for his boat store. The jury heard Ordner recommend to Kelly that he purchase the supplier's entire stock of flares:

"If he doesn't have anything to offer anymore, then nobody can go to him and say 'Well, geez, ah, you got, where do you get your pen guns?' and say, 'Oh, Johnny Jones bought them all from me.' Out-of-sight, out-of-mind." (Gov't. Ex. 6, p. 64)

To allay Kelly's hesitation at purchasing more than the five hundred flares needed for the pen guns, Ordner added:

"They make a hell of a fire, you know. They burn at 2500 degrees." (Gov't. Ex. 6, p. 64)

The jury was clearly entitled to find Ordner's actions a "ready response to the inducement", and hence proof of his predisposition. *See United States v. Viviano*, 437 F.2d at 299. The jury's rejection of the entrapment defense cannot be overturned on appeal. In a recent Seventh Circuit case, the Court stated:

"Entrapment is established as a matter of law only when the absence of predisposition appears from uncontradicted evidence. In the case at bar the evidence bearing on the issue of predisposition was in conflict, and that issue was therefore properly submitted to the jury. The evidence from which the jury could properly have found predisposition included defendant's ready response to the solicitation . . . .. The defense of entrapment was properly submitted to the jury, and the jury was justified in rejecting the defense." *United States v. Spain*, 536 F.2d 170, 173–74 (7th Cir.), *cert. denied*,

429 U.S. 833, 97 S.Ct. 96, 50 L.Ed.2d 97 (1976).

Illegal possession and transfer are conceded. The only remaining questions of whether Ordner acted wilfully and knowingly or was entrapped, coerced or subjected to duress were for the jury. The court's charge on these subjects was exceedingly explicit and fair to both parties. The elements on each side of the "line [which] must be drawn between the entrapment of the unwary innocent and the trap for the unwary criminal" (App. 667) could not have been more clearly set forth. The same clarity is found in the court's charge as to the meaning of "wilfully" and "knowingly". The jury's verdict—and there was adequate evidence to support it—shows that they found that Ordner knew what he was doing and that they rejected his coercion and duress claims. Absent these factors, predisposition remains as to which there was more than sufficient probative testimony.

## AIDING AND ABETTING POSSESSION BY GOVERNMENT AGENTS

Ordner's argument that his conviction on Count Three should be overturned on the ground that it is not illegal to aid and abet the non-criminal possession of firearms by Government agents is similarly unavailing. Ordner contends that since it is not illegal for a Government agent to possess an unserialed firearm obtained while collecting evidence against an accused, it cannot be illegal for the accused to "cause" that possession. This contention flies directly in the face of 18 U.S.C. § 2(b), which provides:

"Whoever wilfully causes an act to be done *which if directly performed by him or another would be an offense* against the United States, is punishable as a principal." (Emphasis added).

Ordner appears to have confused this subsection with 18 U.S.C. § 2(a), which punishes as a principal one who aids or abets the commission of an offense.[6] By its very terms, that subsection requires the commission of an offense, and "[i]t is generally recognized that there can be no conviction for aiding and abetting someone to do an innocent act." *Shuttlesworth v. Birmingham*, 373 U.S. 262, 265, 83 S.Ct. 1130, 1132, 10 L.Ed.2d 335 (1963).

■ It is equally well recognized that the guilt or innocence of the intermediary under a § 2(b) charge is irrelevant. *United States v. Rapoport*, 545 F.2d 802, 806 (2d Cir. 1976); *United States v. Kelner*, 534 F.2d 1020, 1022–23 (2d Cir. 1976); *United States v. Kelley*, 395 F.2d 727, 729 (2d Cir.), *cert denied*, 393 U.S. 963, 89 S.Ct. 391, 21 L.Ed.2d 376 (1968). In *United States v. Kelner, supra*, we held the defendant liable as a principal for causing the transmission in interstate commerce of threatening words in his television press conference, even though the intermediary television station, which actually transmitted the communication, was arguably protected by the First Amendment, and hence innocent of any offense. We stated that "[i]t is clear enough that a person may be held responsible as a principal under 18 U.S.C. § 2(b) . . . for causing another to do an act which would not have been criminal if it had been performed independently by that other person." 534 F.2d at 1022. Thus in the instant case, Ordner is responsible as a principal for causing the possession of unserialed firearms by Government agents, regardless of the fact that the Government agents were themselves immune from criminal responsibility.

## CONSISTENCY OF THE VERDICT

■ Ordner's argument that the jury verdict—guilty on Counts One, Two and Three and not guilty on Counts Five and

---

**6.** 18 U.S.C. § 2(a) provides:

"Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal."

Judge Ward incorporated both subsections of 18 U.S.C. § 2 in his charge:

"You may find Mr. Ordner guilty of count 3 if you find that in fact these pen guns were possessed without proper serial numbers, and that Mr. Ordner caused, induced, aided or abetted the persons who had actual possession of the pen guns at that time."

Six—was legally inconsistent is wholly without merit. It has long been the rule that jury verdicts need not be consistent. *Hamling v. United States*, 418 U.S. 87, 101, 94 S.Ct. 2887, 41 L.Ed.2d 190 (1974); *Dunn v. United States*, 284 U.S. 390, 52 S.Ct. 189, 76 L.Ed. 356 (1932); *United States v. Zane*, 495 F.2d 683, 690 (2d Cir.), *cert. denied*, 419 U.S. 895, 95 S.Ct. 174, 42 L.Ed.2d 139 (1974). In any event, the verdict as to Mr. Ordner does not appear unreasonable. The jury could have found that Ordner responded readily to the "pen gun" plan but showed far more hesitation when it came to the hand grenades. Moreover, the entrapment defense was not the only issue before the jury. Ordner also raised the defense of duress, and one of the bases for his claim of duress was the attempted abduction of his daughter, which took place after the events alleged in Counts One, Two and Three, but before those alleged in Counts Five and Six.

Thus, Ordner's inconsistency argument is both factually and legally insufficient and this Court will not set aside the verdict on this ground.

## CONCLUSION

Although generally any consideration of the sentence is not within the scope of appellate review (nor is it here), almost fifty pages of the record are devoted to the trial judge's consideration of the question. For all practical purposes as yet there has been no final sentence. The highly commendable care and consideration given to this difficult problem is evidenced by Judge Ward's remarks during the proceeding:

"Mr. Ordner has no previous criminal record and the Court takes this into account. However, the charges here are serious and the defendant, right up until today, has indicated a total lack of contrition, stating to the Court earlier that he is not guilty; although he considers himself a victim, he has so advised the Court.

\* \* \* \* \* \*

"The Court is puzzled regarding the defendant. He has two years of college, is married and has a stable family relationship as far as the Court can determine. I know that he sustained injuries in an earlier stage in his life, unfortunately losing one hand and one eye. Because the Court is at this point not as informed of what makes this defendant work as I would like to be, I have decided on a sentence which will give me further information regarding the defendant *so that I can ultimately impose a sentence which is appropriate in this case*." (Transcript at 752–53.) (Emphasis added.)

He concluded with the comment that, pursuant to 18 U.S.C. § 4205(c):

"Basically, what I have done is I have sentenced the defendant to the maximum provided by law with a provision for a study in contemplation of his return before me after three months or an extended period as provided by law, so that I may then resentence him, if it is deemed appropriate, consistent with the study and the report which I received. I want that very clear. That is what I am doing." (Transcript at 758.)

Thus the final chapter of this Governmentally-staged scenario has not yet been written. The record upon which the verdict is based reveals that Ordner had a fair and error-free trial. The resulting verdict must be affirmed.

OAKES, Circuit Judge (concurring):

I concur in Judge Moore's discerning opinion. While Ordner met his burden of proving inducement, the evidence was sufficient to meet the Government's burden of proving predisposition beyond a reasonable doubt. *See United States v. Rosner*, 485 F.2d 1213, 1221–22 (2d Cir. 1973), *cert. denied*, 417 U.S. 950, 94 S.Ct. 3080, 41 L.Ed.2d 672 (1974); *United States v. Weiser*, 428 F.2d 932, 934–35 (2d Cir. 1969), *cert. denied*, 402 U.S. 949, 91 S.Ct. 1606, 29 L.Ed.2d 119 (1971); *United States v. Riley*, 363 F.2d 955, 957–58 (2d Cir. 1966); *United States v. Sherman*, 200 F.2d 880, 882–83 (2d Cir. 1952) (L. Hand, J.). As I have said, "there is no magic formula" for evaluating "predisposition." *United States v. Ortiz*, 496 F.2d 705, 708 (2d Cir. 1974) (dissenting opin-

ion). But the elaborate pretense involved in this case, however clever in conception and successful in operation, *see also United States v. Michaelson*, 552 F.2d 472, 475–476 (2d Cir. 1977), is unquestionably borderline conduct on the part of a government that has a duty not to "create crime for the sole purpose of . . . punishing it," *Butts v. United States*, 273 F. 35, 38 (8th Cir. 1921), *quoted in Sorrells v. United States*, 287 U.S. 435, 444, 53 S.Ct. 210, 77 L.Ed. 413 (1932) (Hughes, C. J.).