UNITED STATES of America, Plaintiff,

v.

Michael GILMORE, Defendant.

No. CR–74–181.

United States District Court,
W. D. New York.

July 28, 1977.

Richard J. Arcara, U. S. Atty., Buffalo, N. Y. (Kenneth A. Cohen, Buffalo, N. Y., of counsel), for the Government.

Runfola, Birzon & Renda, Buffalo, N. Y. (Paul I. Birzon, Buffalo, N. Y., of counsel), for defendant.

CURTIN, Chief Judge.

The defendant in this case was charged with unlawfully distributing heroin in violation of 21 U.S.C. § 841(a)(1). By consent of the parties and the court, trial was held without a jury. Transcript was prepared and the parties submitted briefs on the facts and the law. The defendant testified in his own behalf and admitted selling the heroin, but claimed that he was entrapped by a Government informant who was working directly under the direction of a federal narcotics agent.

Testimony at the trial showed the following. In May of 1974, the defendant Gilmore was the manager of the Down and Under Barber Shop on East Utica Street in Buffalo, New York. Near the end of April 1974, the defendant, in a chance street meeting, was introduced to a Robert King by a man named Finess, whom Gilmore had known for about six months. Unbeknownst to Gilmore, Robert King, also known as Bobby King and Chico, was an informant for the Federal Drug Enforcement Administration [D.E.A.]. During their conversation, King made an appointment for a haircut at Gilmore's shop. He came there later that day and had his hair styled, but nothing of importance occurred. About a week later, on April 30, 1974, King made another appointment with Gilmore. When he arrived, it was late in the afternoon and the other customers had left the shop. After some general conversation, King asked Gilmore if he was interested in making some money. When Gilmore asked King what he had in mind, King said that he had a friend in Toronto who owed him some money and he wanted Gilmore's assistance in carrying out a scheme to get the money back. King proposed that Gilmore sell a quantity of heroin, which King would provide, to his friend for an amount in excess of the usual price, and for more money than King could get if King sold drugs directly to his friend. He said that this man was desperately in need of drugs for his wife or girlfriend and promised to pay Gilmore $300 if the sale was successful.

Gilmore testified that he told King that he did not participate in this type of activity and that he did not want to have anything to do with the proposed scheme. Nevertheless, Gilmore explained, King persisted and stressed the ease with which the transaction could be carried out. After between one and two hours of conversation, Gilmore testified, he reluctantly agreed to the venture. Gilmore admitted he was not threatened and was not afraid of King at any time. He further admitted that he thought about the proposal overnight. According to Gilmore, King came the next morning to the Down and Under Barber Shop at about 11:00 a. m. and met Gilmore alone, giving him a tinfoil packet which Gilmore hid on top of a ceiling panel in the

bathroom of the barber shop. King instructed Gilmore that when he returned later in the day with his friend Gilmore should charge $900 for the heroin.

About 11:30 a. m. on May 1, 1974, King met at the D.E.A. office in downtown Buffalo with Agents John Brown and Joseph Falsetti. Falsetti had never met King before, and in fact did not learn his full name until some days later. Brown had met King in 1972 and was aware that King had been a confidential informant for the Government in Columbus and Cleveland, Ohio in the intervening time period. Brown was also aware that King had an extensive criminal record, including charges placed against him in 1972, 1973 and 1974. Brown testified that King's criminal record did not cause him to question King's reliability.

At that May 1, 1974 meeting, which Brown recalled lasting about one hour, but at which Agent Falsetti was present for only three to five minutes, King advised the agents that he had made an arrangement with Gilmore to bring a friend to the Down and Under Barber Shop at about two o'clock that day for the purchase of an ounce of cocaine for $1,000. Falsetti was to pose as an out-of-town buyer of cocaine for his girlfriend. Although King said that Gilmore might have heroin, it was understood that the purpose of the meeting was to purchase cocaine.

Before going to meet Gilmore, King was searched by the agents and no contraband was found on his person. However, the agents were unaware of King's activities either on the previous day or earlier that morning.

At noon, King called Gilmore saying that they had been delayed at the Peace Bridge but would arrive at the shop shortly. About 2:00 or 2:15, King arrived at the barber shop with Agent Falsetti, whom he introduced to Gilmore as his friend "Rob" from Toronto. When Gilmore learned that Rob was white, he was surprised because he expected that King's friend would be black as he and King were. After Gilmore led them into the bathroom, Rob asked if Gil-

more had any cocaine. Again Gilmore was surprised since only heroin had been mentioned and supplied by King. Not knowing what to say and believing that King would give him instructions later, Gilmore told them to return, saying that he would try to get some cocaine.

When King and the agent returned about 6:00 p. m. that afternoon, Gilmore again ushered them into the bathroom and advised Rob that he had no cocaine. In response, Rob asked for heroin. Gilmore then removed the packet from the ceiling hiding place, opened it at Rob's direction, and King examined it. Gilmore represented that the heroin was of sufficient strength to support a "three-cut." There was some haggling about the price to be paid, Gilmore at first demanding $1,000 and Falsetti, in his role as Rob, offering $800. Finally, Falsetti paid $900 to Gilmore and took the packet. Before leaving he asked: "Well, could you get the cocaine for me?" Gilmore said: "Okay, well I try to get it for you." At trial Gilmore insisted that he said this merely to string Rob along and never intended to obtain any cocaine for him. He said that he thought that King would straighten Rob out and that the problem would be resolved.

At about eight o'clock that evening, according to Gilmore, King returned to the barber shop and, without further conversation, Gilmore gave him $600. King said he would return in a few days for a haircut and left. Gilmore did not ask King why Rob was white or why Rob continued to demand cocaine when the only prior conversation between Gilmore and King was about heroin. Gilmore never saw King again.

On May 2, 1974, the day following the above transaction, Falsetti called Gilmore on the telephone asking about cocaine and Gilmore again told him that he would attempt to get some for him. Falsetti also complained about the quality of the heroin which Gilmore had delivered to him. Gilmore told him the quality was good but did not place any blame on King for any defect in the material. For a period of a week,

Falsetti continued to call Gilmore on the telephone and Gilmore continued to represent to Falsetti that he could get cocaine. However, no further transaction occurred. These conversations were recorded and admitted into evidence at trial.

Gilmore explained that he continued to make these representations because he was afraid for his own safety and did not know what to do since he was not able to get in touch with King. He did not want to reveal to "Rob" that King had hoodwinked him. He attempted to telephone King at the Fairfax Hotel, where King had been staying, but was informed that King had checked out. At the same time, the agents were also attempting to contact King without success. They later learned that he had checked out and left Buffalo.

Shortly after the indictment was returned, defense counsel demanded the production of Robert King at trial so that his involvement could be documented. The Government was unable to locate King and finally learned that he had been killed. As a result, he was not available to defense counsel or the Government at trial.

The Government admits that it is unable to prove the source of the heroin. It argues that Gilmore's story that he obtained it from King should not be accepted, but is unable to offer any evidence to prove Gilmore's explanation false.

In support of the claim of entrapment, the defense called Tanya Perry. She had been arrested for heroin possession on May 4, 1974, was charged in this court, and eventually pled guilty and was sentenced. She never claimed that she was entrapped. Indeed, her evidence was not offered to prove that King had entrapped her, but to explain how he had used the same plan in his approach to her as he used in his approach to Gilmore. Unlike Gilmore, however, it was clear that Tanya Perry had dealt with heroin before her association with King. She had been friendly with Gilmore for about three years prior to May 1974, but denied that he had participated in any drug venture with her including her dealings with King.

King's approach to Perry was a carbon copy of his approach to Gilmore. She testified that in the latter part of April 1974, she was introduced to King by the mysterious Mr. Finess. About the third time they met, King advanced the same money-making scheme that he subsequently used with Gilmore. After Tanya Perry agreed to go ahead with the plan, she eventually met King's partner, John Herritage, who was a black New York State Trooper acting under cover. King delivered the heroin to Perry who, in turn, sold it to Herritage for $900.

There are many reasons not to accept Tanya Perry's testimony. Perry testified she sold the heroin to Herritage at about 1:00 p. m., while Agents Brown and Herritage report the sale occurred at about 6:30 p. m. Perry's assertion that she had never dealt with heroin prior to her arrest is contradicted by recorded conversations with the agents in which she discussed drug transactions. Although she admitted knowing Gilmore for some time, she denied being in Gilmore's shop on the day of her sale to Herritage, even though the agents observed her exiting from there accompanied by King.

Perhaps her story of King's approach to her is untrue, but the difficulty with the Government's position is that its informer, King, is not available for testimony. On almost every point, the court disregards the testimony of Tanya Perry. However, I cannot accept the Government's argument that the drugs Perry sold to Herritage came from Gilmore. There is no evidence in the case to support this beyond the fact that Perry was in Gilmore's shop. It is just as likely that she received the drugs from King or from another source.

In *United States v. Sherman*, 200 F.2d 880, 882–883 (2d Cir. 1952), Judge Learned Hand explained that a defense of entrapment presents two issues:

(1) did the agent induce the accused to commit the offence charged in the indictment; (2) if so, was the accused ready and willing without persuasion and was he awaiting any propitious opportunity to

commit the offence. On the first question the accused has the burden; on the second the prosecution has it.

Later, the Supreme Court had occasion to discuss the same case in *Sherman v. United States,* 356 U.S. 369, 78 S.Ct. 819, 2 L.Ed.2d 848 (1958). Chief Justice Warren defined the issue as:

whether the informer had convinced an otherwise unwilling person to commit a criminal act or whether petitioner was already predisposed to commit the act and exhibited only the natural hesitancy of one acquainted with the narcotics trade.

356 U.S. at 371, 78 S.Ct. at 820.

■ On the question of Government inducement, the cases hold that the amount of pressure applied to the defendant by the Government agent is not the issue. The question is merely whether the Government initiated the crime. *United States v. Cohen,* 431 F.2d 830, 832 n.2 (2d Cir. 1970); *United States v. Dehar,* 388 F.2d 430, 433 (2d Cir. 1968); *United States v. Riley,* 363 F.2d 955, 958 (2d Cir. 1966). Certainly if Government agents merely afford opportunities or facilities for the commission of offenses, that does not constitute inducement or persuasion. *Sorrells v. United States,* 287 U.S. 435, 53 S.Ct. 210, 77 L.Ed. 413 (1932). However, the stratagem employed by King was more than an opportunity. There was a sufficient amount of inducement or persuasion set forth in the record for the defendant to satisfy the first *Sherman* requirement that the agent induced the defendant to commit the crime. *See Sorrells v. United States, supra; Sherman v. United States, supra; United States v. Cohen, supra.*

■ In *United States v. Viviano,* 437 F.2d 295, 299 (2d Cir.), *cert. denied,* 402 U.S. 983, 91 S.Ct. 1659, 29 L.Ed.2d 149 (1971), the court explained the kinds of evidence the Government can use to show propensity:

Once the defendant demonstrates inducement, the Government may prove propensity by showing (1) an existing course of criminal conduct similar to the crime for which the defendant is charged, (2) an already formed design on the part of the accused to commit the crime for which he is charged, or (3) a willingness to commit the crime for which he is charged as evidenced by the accused's ready response to the inducement.

*See also United States v. Anglada,* 524 F.2d 296, 299 (2d Cir. 1975). The Government must prove the defendant's predisposition beyond a reasonable doubt. *United States v. Ordner,* 554 F.2d 24, 30 (2d Cir. 1977); *United States v. Steinberg,* 551 F.2d 510, 514 (2d Cir. 1977).

There is no evidence in this case showing an existing course of criminal conduct similar to the crime charged. Although Gilmore admitted using robitussin and other cough syrups containing traces of codeine, there is no evidence that he had been involved in other narcotics use or transactions, or that he had formed a plan to commit the crime charged before King approached him. Agent John Brown testified that the records of the D.E.A. did not reflect any derogatory information about Gilmore.

The Government did offer evidence to show that some known narcotics addicts were seen entering and leaving the Down and Under Barber Shop. But the fact that some of his customers are addicts, which Gilmore readily admitted, cannot be considered as evidence of past involvement or present interest in narcotics on Gilmore's part. To draw such a conclusion would stigmatize many small shopkeepers in certain areas of every large city.

Nor can I find a ready intent on the part of the defendant to commit the crime charged. The Government argues that there was evidence of the accused's ready response to the inducement, pointing out that there was no reason for Gilmore to enter into this arrangement with King beyond criminal intent. In addition, Gilmore had only a brief prior relationship with King, did not feel threatened and was not forced into the transaction. It was not a spur of the moment decision on Gilmore's part because, after initially agreeing to

King's proposal, he was able to think about it overnight. Gilmore accepted King's plan in order to make $300. Even after the first meeting on the afternoon of May 1, 1974 with King and Agent Falsetti, Gilmore could have easily terminated the sale but did not. Although he was surprised that Falsetti was white and that he inquired about cocaine rather than heroin, nevertheless Gilmore completed the transaction. The Government argues that Gilmore embraced the plan for profit, that he had adequate opportunity to think about it, that he took into account all of the disadvantages connected with it, but decided to go ahead with it anyway. Certainly all of these considerations weigh heavily against Gilmore and in the ordinary case might be enough to spell out sufficient evidence to support a finding of propensity. But the difficulty with the case is that, through no fault on his part, Gilmore is deprived of the testimony of King.

In a case such as this, the absence of testimony from the informant is not necessarily fatal to the Government's case. If the defendant's testimony were simply incredible, the court could disregard it completely and find the defendant guilty even though his testimony stands unrebutted. *See Masciale v. United States,* 356 U.S. 386, 78 S.Ct. 827, 2 L.Ed.2d 859 (1958); *United States v. Gurule,* 522 F.2d 20, 24 (10th Cir.), *cert. denied,* 425 U.S. 976, 96 S.Ct. 2177, 48 L.Ed.2d 800 (1976); *United States v. Jett,* 491 F.2d 1078, 1080 (1st Cir. 1974); *United States v. Pugliese,* 346 F.2d 861, 863 (2d Cir. 1965). *But see, United States v. Bueno,* 447 F.2d 903 (5th Cir.), *cert. denied,* 411 U.S. 949, 93 S.Ct. 1931, 36 L.Ed.2d 411 (1973). However, I find that the defendant's story, while farfetched, contains a certain plausibility, particularly in light of the actions of the Government's informant.

King was being provided subsistence level payments by the Government for his services. No other source of income for King was known to the Government. Yet both Agents Brown and Falsetti testified that King dressed expensively and stayed at a pleasant hotel. According to Gilmore, King displayed large sums of cash. King

began to cooperate with the Government in Buffalo only shortly before the sale in this case occurred. He left Buffalo on the day of the sale or shortly thereafter without notifying the D.E.A. and without leaving a forwarding address.

■ King was clearly not as reliable as Agents Brown and Falsetti believed him to be. If Gilmore's story is true, it would certainly have been in King's best interests to disappear quickly. King's performance as the Government's informant, and his prior record, give this court no basis for accepting the information he gave the D.E.A. The Government cannot disassociate itself from its informant's actions. *Sherman v. United States, supra,* 356 U.S. at 373, 78 S.Ct. 819.

If the agents knew that Gilmore had no predisposition to deal and that King had intended to persuade him to participate in the venture in the manner related by Gilmore, it would have been unthinkable for them to permit King to go forward with his plan. As Justice Warren stated in *Sherman v. United States, supra* at 372, 78 S.Ct. at 820,

> The function of law enforcement is the prevention of crime and the apprehension of criminals. Manifestly, that function does not include the manufacturing of crime. Criminal activity is such that stealth and strategy are necessary weapons in the arsenal of the police officer. However, "A different question is presented when the criminal design originates with the officials of the Government, and they implant in the mind of an innocent person the disposition to commit the alleged offense and induce its commission in order that they may prosecute." 287 U.S., at 442 [53 S.Ct. [210] at 212]. . . .
>
> . . . Entrapment occurs only when the criminal conduct was "the product of the *creative* activity" of law-enforcement officials. (Emphasis supplied.)

■ I find that the Government has not proved beyond a reasonable doubt that the defendant Michael Gilmore was predisposed to commit the offense charged.

The ruling in this case is not contradicted by the teaching of *United States v. Russell,* 411 U.S. 423, 93 S.Ct. 1637, 36 L.Ed.2d 366 (1973), or by *Hampton v. United States,* 425 U.S. 484, 96 S.Ct. 1646, 48 L.Ed.2d 113 (1976), as the Government urges but is, in fact, supported by these cases. In *Russell* the defendant had manufactured the prohibited material previously and admitted "that he may have harbored a predisposition to commit the charged offenses." 411 U.S. at 433, 93 S.Ct. at 1643, quoting the circuit court opinion, 459 F.2d 671, 672 (9th Cir. 1972). In *Hampton,* under either version of the facts, defendant was predisposed to deal in heroin. According to the Government's version, Hampton made the initial overture to the Government informer to supply drugs when he saw tracks on the informant's arm. According to petitioner's version, he did not argue that he was not predisposed. In fact, he urged the court to charge the jury that his predisposition need not be considered if the Government supplied the contraband.

I believe I must accept Gilmore's testimony that he received the heroin from King. The Government is unable to bring forth any other explanation. Although vigorously cross-examined, no reason is given not to accept Gilmore's testimony. Certainly Gilmore has an important stake in the outcome of this case, but I cannot find falsity on that ground alone. In addition, Gilmore's story of King's representation to him is farfetched; yet we return to the problem that King, who was the agent's man, is simply not available. The Government has failed to convince me beyond a reasonable doubt that Gilmore's explanation was a fabrication. The defendant is acquitted.

So ordered.